PERCY J. MUNDY and ALICE MUNDY, His Wife;
 WM. T. BRIDLE, Individually; WM. T. BRIDLE,
 President of the Baltimore and Ohio Investment
 Co.; BALTIMORE AND OHIO INVESTMENT
 CO., a Corporation, Incorporated Under the Laws
 of the State of Ohio and CHARLES R. SCHIRM,
 Attorney, *vs.* IRA J. JACQUES, by Joseph C.
 Jacques, His Next Friend.

*Bills of sale; recording; unnecessary where chattels are deliv-*
 *red. Corporations; creditors' rights; bill of sale by cor-*
 *poration to president, individually; without delivery;*
 *presumption. Foreign judgments; jurisdic-*
 *tion of Court; presumption; proof*
 *of papers and records.*
 *Evidence.*

If a *bona fide* sale is to be made by a corporation to its presi-
dent, individually, of its property, the situs of which is not
changed, there should be recorded an instrument of writing
which would inform the public of the change of title, and the
president should make oath as to the *bona fides* of the sale.

p. 13

Otherwise the instrument is wholly void, and it can not be
assumed that such a delivery was made, as under section 41 of
Article 21 of the Code of Public General Laws would render
a recorded bill of sale unnecessary.                    p. 13

As against creditors a transfer of property must be *bona fide*
as well as for value.                    .                    p. 16

Even if *bona fide,* the law will not permit the president of the
corporation to take over all its property to the prejudice of
creditors, especially when he paid the consideration to the
stockholders and not to the corporation.                    p. 17

The Courts of this State may inquire into the jurisdiction of
a Court of another State which has rendered a judgment
sought to be enforced here; but the presumption is in favor of
their jurisdiction and of the officer's return to process.    p. 20

Opinion of the Court.                    [116

While it may not always be necessary to have a complete record of a foreign judgment to make it admissible in evidence when it is sought to obtain a decree based on the judgment of another State, yet, if the answer in effect pleads *nul tiel* record and specially denies the jurisdiction of a foreign Court over the debtor, it is necessary and proper to require a complete record.                                     p. 23

Papers in a case relating to a foreign judgment which is sought to be enforced, which are certified to only by the clerk of the foreign Court, alone are not such an exemplification of the record as authorized by section 40 of Article 35 of the Code of Public General Laws.                                  p. 23

Certain papers, purporting to be certified copies of the records of a corporation, ratifying sales of its property, releases, receipts, etc., were shown to and left with an attorney. They were subsequently lost. It was not shown that the attorney knew the signatures of the parties, or that he knew more about the papers than what he was told by the party leaving them. *Held*, that the testimony of the attorney as to what the papers were was only hearsay and inadmissible. pp. 15-16

*Decided June 22nd, 1911.*

Appeal from Circuit Court No. 2 of Baltimore City (STOCKBRIDGE, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE and URNER, JJ.

*J. Cookman Boyd* (with whom was *Charles R. Schirm* on the brief), for the appellants.

*John P. Bruns* (with whom were *Gibson* and *Smith* on the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree of Circuit Court No. 2 of Baltimore City, declaring a bill of sale from the Balti-

more and Ohio Investment Company to William T. Bridle
to be null and void and of no effect, and decreeing that the
sum of $4,102.81, with interest, be paid by the Investment
Company to the plaintiff.    As printed in the record there
was apparently no corporate seal attached, but if the word
"Seal" opposite the president's name was intended to repre-
sent the corporate seal of the company, the instrument was
not acknowledged as required by section 41 of Article 21 of
the Code.    Nor was there an affidavit by the vendee that the
consideration was true and *bona fide* as therein set forth as
required by section 50 of that article.

It is true that section 41 provides that nothing therein
contained shall be construed to extend to any such sale or
gift as is therein mentioned when accompanied by delivery,
but this instrument purported to be executed for the com-
pany by William T. Bridle, President to William T. Bridle,
individually, and to permit William T. Bridle, President, to
deliver the property to himself individually, and thereby
avoid the necessity of executing a bill of sale as required by
the statute would make the statute a farce, instead of what
it is intended to be—protection of the public against secret
transfers of personl property.    If the property originally
belonged to the Investment Company, the public would not
be informed that Bridle was in possession as an individual
owner by an attempted delivery to himself.    If a *bona fide*
sale is to be made by a corporation to its president of prop-
erty, the situs of which is not even changed, there should be
recorded an instrument of writing which would inform the
public of the change in title, and especially should he be
ready to make oath to the *bona fides* of the sale.    The absence
of such affidavit on an instrument which is recorded would
cause strong suspicion that it was because he could not truth-
fully make it.    We are of opinion, therefore, that this instru-
ment was not only wholly void, but that there was a total
failure to prove such delivery as would avoid the necessity
for a bill of sale.

It is impossible to escape the conclusion from this record that the transaction was an effort to put the property beyond the reach of this creditor. The judgment on which the appellee is relying was obtained against Percy J. Mundy, Alice Mundy, his wife, and the Baltimore and Ohio Investment Company in the Superior Court of Cook County, Illinois. On the 8th of February, 1908, suit was brought on that judgment in Baltimore under the Rule Day Act, and judgment was obtained thereon on the 25th of November, 1908, against the Mundys. The record is not clear as to that, but we suppose the Investment Company was not served with process in that case. At any rate the judgment was not against it. Percy J. Mundy was the son-in-law of William T. Bridle, Mrs. Mundy being his daughter, and was in charge of the property. According to the date in the bill of sale it was executed on March 25th, in Baltimore, and the circumstances · all go to show that Bridle knew that the judgment was about to be or had just been obtained against the Mundys, and an attachment against the Investment Company was issued just about the hour that the bill of sale was put on record on March 26th. Just how long Bridle was in Baltimore is not shown, but the record does show that although he was summoned on March 26th to answer the bill, the injunction, which was ordered on March 28th and served on Mundys on March 30th, was returned non sunt as to William T. Bridle, individually and as president of the Investment Company.

But beyond all that, when it is attempted to show that there was a valid consideration for the bill of sale, what do we find? The papers which Mr. Schirm spoke of as being in his possession disappeared and were not offered in evidence. Mr. Schirm's explanation is that they were in "a very large envelope" which he placed on a box next to his desk in which papers were filed; and he sometimes threw waste paper on that box and as the janitor would sometimes leave the scraps of paper there he told him to take them off and his theory is that the janitor had thrown the envelope with the waste paper, which had been carted away.

Mr. Mundy testified, in speaking of the consideration in the bill of sale, "The payment was made by check, I believe. In fact, I know it was. I saw the check." Then he was asked, "What do you know about the payment; how do you know it was paid?" and replied, "Why, the cancelled checks for the stockholders Mr. Bridle sent me to go to Mr. Schirm, and I turned them over to Mr. Schirm." He said the cancelled checks were payable to the different stockholders of the corporation, that he could remember four out of the five stockholders, but could not be positive as to the fifth, that he knew the signatures on the checks which went through the bank. He did not state who the stockholders were, how much each check was for, or give the dates of them. So far as the record discloses one of them might have been to Bridle himself for the greater part of the $6,000.00, the consideration mentioned in the bill of sale. The judgment in Illinois was then standing against the company, whether valid or not. It is true that the appellants claim that that was not known to the company, but when the relationship between the Mundys and Bridle is considered in connection with the proceedings by the attorney in Illinois, it would require more than we have in the record to convince us that it was not known that the judgment by default had been rendered against the Investment Company.

In his testimony Mr. Schirm speaks of the checks and various papers which were left with him and were lost as explained, but it is perfectly manifest that his testimony as to them is hearsay of the most pronounced character. The substance of it is simply that Mundy and Bridle left certain papers with him which he in a very general way described, but he made no attempt to establish the authenticity of any of them. If it be admissible to have a client deliver to an attorney papers purporting to be a certified copy of the records of a corporation ratifying the sale of its property, cancelled checks to various stockholders, releases and receipts of the stockholders, etc., and then when the papers are lost to permit the attorney to testify to them as such papers as

they purported to be, there would be no protection against fraud—however honest the attorney may be. We will assume that Mr. Schirm believed that these papers were what they purported to be, but he does not pretend to say that he knew the signatures of the parties, or that he had any knowledge as to what they were excepting what he got from Bridle and Mundy. He does not attempt to give their contents, but simply said what they were. Bridle was not called as a witness, and although it was stated at the argument that he was at some remote point, the record does not disclose that any effort was made to have the case postponed until he or his deposition could be procured. Over two years had elapsed between the filing of the bill and the hearing of the case. Bridle not only had a considerable sum of money involved in the controversy, but he was charged with such fraud as ought to cause an honest man to make great sacrifices in order that he might meet the charge.

The circumstances undoubtedly tend to show that the bill of sale was given, when and as it was, with the intent to hinder and delay the plaintiff, and that there was every reason to believe that the plaintiff would proceed against the investment company by way of attachment. If the law permitted a president of a corporation to buy all of its property just as it is likely to be seized by a creditor, and even pay the consideration to the stockholders instead of into the treasury of the company, where it might be reached for its debts, it would sanction and encourage fraud instead of condemning and checking it. It is well settled that as against creditors a transfer of property must be *bona fide* as well as for value, *Chatterton* v. *Mason,* 86 Md. 236, *McCauley* v. *Shockey,* 105 Md. 641, and other cases, and it would require very strong evidence to overcome the presumption of fraud that it raised by the conduct of Bridle and the circumstances of this case.

So without prolonging the discussion on this branch of the case, we would have no hesitation in declaring this attempted transfer of the property formerly held by the Investment Company null and void against a subsisting creditor of that

company, even if the bill of sale had been executed in accordance with the requirements of the statute, or if there had been sufficient evidence of such delivery of the property as would have made a bill of sale unnecessary, as the law will not permit a president of a corporation to thus take over all of its property to the prejudice of its creditors—especially when, according to the evidence offered in his behalf, he paid the consideration to the stockholders and not to the company. The next question presented by the brief of the appellants is whether the Illinois Court had acquired jurisdiction over the Investment Company—it being contended that it had never been served with process. Assuming for the present that the records of the proceedings in that State offered in evidence are sufficient, let us see what they show. The summons against the Mundys and the Investment Company was issued on July 12, 1907. The return of the sheriff as to that company was "Served this writ on the within named Baltimore and Ohio Investment Company, a corporation, by delivering a copy thereof to Percy J. Mundy, director of said corporation, this 19th day of July, 1907. The president of said corporation not found in my county." On the 7th of August, 1907, what is spoken of as an order of default was entered, in which, together with other things, is the statement that "it appearing to the Court that due personal service of process of summons issued in said cause has been had on the defendants for at least ten days before the first day of this term." Then on the 10th day of August, the following proceedings took place, "This day comes the defendant by their attorney, and enter herein their motion to set aside and vacate the order of default heretofore entered herein of record on the 7th day of August, A. D. 1907, which motion is entered and continued to the 16th day of September, A. D. 1907." On the 24th of October on motion of defendants' attorney, it was ordered that leave be given the defendants to file an additional affidavit by October 31st and that a hearing of said cause be set for November 2nd. On that day it was ordered that the defendants' motion to set aside

and vacate the order of default be overruled and that said cause be set for hearing to assess the damages for Monday, December 9th, 1907. On December 7, 1907, there was another order "that the defendants' motion to set aside and vacate the order of default heretofore entered herein of record on the 7th day of August, A. D. 1907, be and is hereby overruled and denied."

An order of December 13th, 1907, is set out in the record which shows that reference was had to a jury to assess the plaintiff's damages against the defendants. The names of the twelve jurors are then given, and the order concludes that they "after hearing of the evidence adduced, say: 'We, the jury, assess the plaintiff's damages at the sum of thirty-five hundred dollars.' Thereupon the defendants entered herein motions in arrest of judgment." On the 4th of January, 1908, a formal order was entered under a titling of the plaintiff against the three defendants which begins, "This cause coming on to be heard upon the defendants' motion entered herein for a new trial in said cause, after arguments of counsel and due deliberation by the Court, said motion is overruled and a new trial denied. Thereupon the defendants enter herein their motion in arrest of judgment, which motion is also overruled," and a formal judgment was entered in favor of the plaintiff against the defendants for the thirty-five hundred dollars assessed by the jury, together with costs. Whereupon the defendants prayed an appeal, which was allowed on their filing a bond, etc.

The record further shows that Mr. Erbstein, attorney for the defendants, gave notice to the attorney for the plaintiff that he would ask on the 10th of August, 1907, "that the default heretofore entered in the above entitled cause be set aside," and that he would, in support of the motion, offer an affidavit of George F. R. Summerow, who was associated with Mr. Erbstein, a copy of which was attached. Both the motion and the affidavit have the title of the case in the Superior Court of Cook County, and the names of the two Mundys and the Baltimore and Ohio Investment Company are set

out as the defendants. There was no suggestion in the motion, the notice of the motion or the affidavit, that the Investment Company had not been served with process, and, as we have seen, the notice referred to "the default heretofore entered," and that default was against the three, and the affidavit states "that the aforesaid defendants" have a good and meritorious defense"—"the aforesaid defendants" are the two Mundys and the Investment Company. The only paper in the record which does in any way cast any doubt on the subject is one filed on August 7th, 1907, after the default, in which Mr. Erbstein stated, "I hereby enter the appearance of Peter J. Mundy and Alice J. Mundy as defendants in the above entitled cause, and my appearance as their attorney in the above entitled case," but that is not explained and he must have known that the default was against the three as there was nothing in the order or judgment of the Court to limit it to the two. The return of the sheriff of Cook County shows that he served the summons on the Investment Company by delivering a copy to Percy J. Mundy, on Percy J. Mundy and Alice Mundy, by reading the same and leaving a copy with each of them. When Mr. Mundy was on the stand in this case he produced three copies of the summons, and it would seem strange that, even if he did not, the attorney would not know, that, as there were three defendants named in the summons, the three copies were intended for them. An examination of the return of the sheriff would have shown for whom they were intended, and it is not likely that an attorney would have endeavored to set saide the default without knowing what the return was. Mr. Erbstein's testimony was not taken.

But if the facts referred to left the question in doubt, the bill in equity filed by the Investment Company in Illinois alleges that "on the 7th day of August, A. D. 1907, after the default had been entered in said suit, an appearance of your orator and the other parties named as defendants in said suit, and the appearance of the said Charles E. Erbstein as their attorney was filed by the said Charles E. Erb-

stein, and that thereafter the said Charles E. Erbstein made various ineffectual attempts on behalf of your orator and the other parties defendant to (the) cause to have the default thereinbefore entered in said suit set aside, but all without any authority or knowledge on the part of your Orator or any of its officers, agents or employees."

It is therefore shown by the record that the Investment Company was returned summoned, that an attorney was undoubtedly employed to defend the individual defendants and that after default that attorney appeared for all three defendants, made numerous efforts to have the default set aside and upon failure to do that represented the defendants when the damages were assessed and made motions for a new trial and in arrest of judgment. The daughter and son-in-law of Bridle certainly knew that Erbstein was appearing in the case, and it is difficult to believe that one or both of them did not inform Bridle of the plaintiff's proceedings, if he was the president of that company. But, as we have seen, there was no objection made on the ground that the company had not been properly served until its property was seized in Baltimore, and then, it also sought to escape the attachment by attempting to transfer the property to Bridle, individually, under such circumstances as give some foundation for the allegation in the answer filed in the Chancery case in Cook county that the Mundys were the real owners of the property. Mundy was one of the original incorporators of the company, and seems from the record to have had more connection with it than anyone else.

While a Court of one State can inquire into the jurisdiction of the Court of another State, which has rendered a judgment sought to be enforced, the presumption is in favor of the jurisdiction, and, of course, an officer's return to process. It is scarcely necessary to cite authorities to sustain such a familiar principle of law, but for convenience we will refer to 17 *Am. & Eng. Ency. of Law,* 1073, where many cases, including some of those in this State, are cited. It is there said, "A superior court of general jurisdiction,

proceeding within the general scope of its powers, is presumed to have jurisdiction to give the judgment it renders until the contrary appears; and this presumption embraces jurisdiction not only of the cause or subject-matter of the action, in which the judgment is given, but of the parties also. It will accordingly be presumed that all the facts necessary to give the Court jurisdiction to render the particular judgment were duly found. Thus to illustrate the rule, unless the contrary appears, it will be presumed * * * that there was due service of process or appearance by the parties; that an appearance by an attorney was authorized", etc. As we are satisfied that this record shows that the Investment Company had ample opportunity to show that it was not properly served in the Illinois Court, if that was the fact, and as it failed in the only attempt it has made in that State to have the judgment set aside on the ground that it was not properly served, we are not willing to accept the unsupported statement of Mundy as sufficient to overcome the presumptions we have spoken of, and the many circumstances which tend to contradict him, and cannot declare the judgment void if the records which are before us correctly state the facts.

That brings us to the consideration of the sufficiency of those records. We do not regard those of the proceedings in Illinois under which the judgment was obtained sufficient to enable the Court to enter a personal decree on it. While it may not always be necessary to have a complete record of a foreign judgment to make it admissible, when, as in this case, it is sought to obtain a decree based on the judgment of another State, and the answer in effect pleads *nul tiel record,* and also specifically denies that the Illinois Court had jurisdiction over the defendants, it would seem to be necessary and proper to require a complete record. Section 40 of Article 35 of the Code provides that, "An exemplification of the record, under the hand of the keeper of the same and the seal of the Court or office where such record may be made, shall be good and sufficient evidence in any Court of

this State to prove any debt of record made or entered *in any other of the United States, or in any foreign country*, and section 64 of that Article provides that, "Short copies of judgments or decrees rendered by any Court of record *of this State,* certified by the clerk under the seal of the Court, with the docket entries, shall be admissible evidence in any other Court in this State, to prove the recovery of such judgment or decree; and it shall not be necessary to produce a full exemplified copy of the record in order to prove such judgment or decree." The Code, therefore, in terms makes a distinction between the record of a foreign judgment and that of a domestic judgment. In *Orndorff* v. *Mumma,* 3 H. & J. 70, the judgment was reversed because the lower Court had admitted in evidence a record of an action in the general Court which did not contain a plat or copy thereof. At that time plats in ejectment cases were considered as part of the record. The Court said, "Part of the record only being produced, was not sufficient evidence to support the action in this case." The case of *McCormick* v. *Deaver,* 22 Md. 187, is to the effect that a record of a decree, certified under the Act of Congress, which showed that all the proceedings affecting the merits of the case had not been transmitted would be defective. See also, 17 *Cyc.* 355.

In this case it was peculiarly important that the record of the judgment in the Illinois Court be complete. It may be possible that something was done which would materially reflect upon the question before us, but we cannot tell whether all of the papers had been certified, unless we hold that the record which the Court required the defendants to produce was sufficient, and that it was properly admittd. But in that copy the clerk certified, "the above and foregoing to be a true, perfect and complete transcript of the record", except the Praecipe, the declaration and the verdict. That copy is certified under the Act of Congress. After the appellee succeeded in having that admitted, he procured a copy of the notice of the motion to strike out the default and of the affidavit of George F. R. Cummerow (neither of which is

in the record produced by the defendant), also copies of the Praecipe, of another motion and affidavit as to the default and of the declaration. All of those copies are certified by the clerk alone and not under the Act of Congress.

It is not necessary to pass on the question whether under the circumstances the Court was right in requiring the defendant to produce the copy of the record in order that the plaintiff could offer it in evidence, as we are of the opinion that it was a defective copy, showing on its face that it did not include parts of the original record which may be material. Indeed, some of the papers subsequently filed by the plaintiff showed that there were others in addition to those excepted by the clerk. Those which were thus subsequently offered being certified by the clerk alone cannot be said to be such exemplifications of the records as are authorized by section 40 of Article 35. Neither one of these papers could prove any debt of record, and that section does not authorize such authentication of copies of paper of their kind.

We are also of opinion that the copies of the bill, answer and order in the *Chancery case* were not admissible as offered. There should be a full record containing all of the papers. The order refers to the Master's report and the bill is dismissed for want of equity pursuant to that report, but it is not in the record. The copy of that order is also only certified by the clerk, although the copies of the bill, and answer were each certified under the Act of Congress.

So without meaning to hold that under all circumstances the copy of a record must contain every paper filed, whether relevant or not to the question for which they are to be used, we are of the opinion that the Court erred in admitting these parts of what are supposed to be the records of the law and chancery cases in Illinois, and that there should be complete records of them. We will reverse the decree, and remand the cause and the plaintiff can then obtain full and complete copies, unless that can be avoided by agreement. We have referred to the other questions raised, so our views as to

them would be known to the parties and possibly save some further litigation, but of course if the complete records present different facts from those we have assumed to exist from what we have before us, reflecting upon the jurisdiction over the Investment Company, the parties will not be precluded by what we have said on that subject. The lower Court can also, if it deems the ends of justice require it, allow further testimony to be taken after those records are offered in evidence.

> *Decree reversed and cause remanded, the appellee to pay the costs.*