## DAMAZO ET AL. *v.* WAHBY ET AL.

[No. 98, September Term, 1970.]

*Decided November 17, 1970.*

628

Motion for rehearing filed on December 15 and 16, 1970; denied January 4, 1971.

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*Joseph A. Lynott, Jr.,* for appellants David S. Damazo, Willowbrook Development Company, Inc., Vance Properties, Inc., and Robert L. Taylor.

*Andrew W. Starratt, Jr.,* with whom were *Barbee & Starratt* on the brief, for appellants John L. and Irene Toth.

*Warren K. Kaplan,* with whom was *David S. Goldberg* on the brief, for appellee Nimer S. Wahby.

*James K. Foley* for appellee and cross-appellant Fliegel Properties Management, Inc.

HAMMOND, C. J., delivered the opinion of the Court.

An appellee, Wahby, was found to have been the procuring cause of the sale of a high rise apartment building (Edwards Way) situated in Montgomery County. The appellant Damazo was the controlling stockholder and president of Willowbrook Development Company, Inc. (Willowbrook), which held title to Edwards Way. Judge Shearin, sitting without a jury in the Circuit Court for Montgomery County, gave Wahby a judgment for $47,500 (5% of the sales price of $950,000) against Willowbrook and Damazo, and also gave Wahby two judgments against Damazo, John Toth, Irene Toth, his wife, and Robert L. Taylor (who were purchasers), one for

tortiously interfering with Wahby's contract right to a commission, for compensatory damages in the sum of $1.00 and for punitive damages in the sum of $5,000 each, and the other for conspiring to deprive Wahby of his commission, in the sum of $1.00 compensatory damages.

Damazo was also the controlling stockholder and president of Vance Properties, Inc. (Vance), a corporation that held title to a garden apartment cluster (Riggs Road) that adjoined Edwards Way. Judge Shearin found the appellee Pinkas Fliegel to have been the procuring cause of the sale of Riggs Road to John and Irene Toth for the price of $770,000 and gave judgment for Fliegel in the sum of $38,500 against Damazo and Vance. Judge Shearin also gave Fliegel two judgments against Damazo, John Toth and Irene Toth, one for tortiously interfering with Fliegel's contract right to his commission in the sum of $1.00 compensatory damages and $5,000 punitive damages, and one for conspiring to deprive Fliegel of his commission in the sum of $1.00 compensatory damages.

Although the testimony was conflicting on many points, there was evidence that permitted Judge Shearin properly to make the findings of fact he made. Fliegel testified that Damazo, president of Willowbrook and Vance, orally employed him in 1966 to sell Riggs Road for $925,000 and Edwards Way for $1,150,000 for an agreed commission of 5%, and never revoked the agency. In January 1967 Mrs. Toth, in response to an advertisement, called Fliegel, who showed her Riggs Road on at least three occasions (in January 1967, the fall of 1967, and in February 1968). Negotiations continued through February 1968. Fliegel introduced Mrs. Toth to Damazo and advised him by letter in March 1967 of her interest in Riggs Road. Mr. Toth, a resident of Falls Church, Virginia, without ever having been told about the properties by his wife, happened, he said, to see Riggs Road and Edwards Way while driving and inquired in December 1967 or January 1968 whether they were for sale. He looked at no other buildings in Maryland. Damazo gave Toth fi-

nancial data on both properties in January 1968. There-after, Toth dealt directly with Damazo and in April 1968 arrived at an oral agreement to buy Riggs Road for $810,-000, which was later reduced to $770,000 in a written contract signed by Vance and the Toths on April 30, 1968. The Toths took title in the name of Coronado-Adelphi, Inc. (Coronado), a corporation set up for the purpose. Coronado assumed the first trust, paid $75,000 in cash and gave Vance a second deed of trust in the amount of $128,000. The Toths guaranteed the trusts.

On June 17, 1968, Coronado took title to Edwards Way from Willowbrook for $950,000, giving back a second deed of trust for $192,500. After the sales were consummated, Vance and Willowbrook transferred the second trust notes to Damazo, who owned two-thirds of the stock in each corporation, and Mrs. Damazo, who held one-third.

On March 14, 1968, Wahby, as broker, and Vance and Willowbrook, as owners, executed a thirty-day exclusive agency agreement wherein Wahby promised to list and to try to sell Riggs Road and Edwards Way. The parties agreed, the corporations by Damazo, to extend the agreement on a non-exclusive basis after it expired on April 12. The non-exclusive agency was never revoked. The agreement provided for a commission of 5% on "the above mentioned price, or * * * any other price acceptable * * *."

On April 21 Wahby advertised a number of properties, including Riggs Road and Edwards Way, in the Washington Post. He received only two or three calls. One was from Toth on April 21 and another from Taylor on April 23. On Sunday, April 21 Toth telephoned Wahby, although he had not called a broker for four or five years. Wahby gave Toth pertinent information about both Riggs Road and Edwards Way, including location, amount of the first trusts and apartment sizes. Toth gave no sign of prior familiarity with either property but asked Wahby to meet him to go over the financial statements. The next day, Monday, Mrs. Toth called to make an appointment.

Toth called later the same day to break the engagement, and never called again. For a period of two years in the early 1960's Toth and Taylor had worked side by side at desks eight feet apart as engineers at an engineering company and had visited each other's home. They had renewed their acquaintance in 1965 or 1966. On Tuesday, Taylor called Wahby and on April 28 Wahby showed Taylor Riggs Road and Edwards Way.

The next morning Taylor, totally inexperienced in real estate deals and unadvised, told Wahby to draw a contract for Riggs Road for $750,000. When Wahby took Taylor the contract, Taylor told him he had a partner (and on another occasion revealed that the partner resided in Virginia) and retired to call his partner. When he returned, Taylor changed the interest rate on the proposed second trust from 7% to 6% (the rate in the contract Toth signed on April 30). Damazo would not sign for $750,000 and Taylor rejected his counter offer of $780,000; the next day Toth offered Damazo $760,000 and they settled for $770,000. Wahby learned that Toth had bought Riggs Road and called the Toth home. Mrs. Toth told him they were not interested in Riggs Road and later, when advised that Wahby knew they had bought it, said "talk to our lawyer.". Taylor told Wahby he knew no one named Toth. He told one Kiger, a fellow worker who became an investor in Coronado, that he was first interested in Riggs Road and Edwards Way by Toth.

On May 15, 1968, Coronado was incorporated by Toth, Mrs. Toth and Taylor, who became owners of 90% of its stock. On June 5, 1968, Coronado executed a contract with Willowbrook to buy Edwards Way for $950,000. Taylor provided the $10,000 deposit and the $57,000 cash paid at settlement. His stock purchase in Coronado was contingent on the purchase of Edwards Way being consummated. On June 17, Willowbrook deeded Edwards Way to Coronado. About a year later, Coronado was dissolved, and Edwards Way was transferred to Taylor and his wife (90%) and two investors Taylor had brought in (5% each). Riggs Road went to the Toths.

Judge Shearin did not err in holding that Fliegel was the procuring cause in the case of Riggs Road and in finding, contrary to Fliegel's contention in his cross-appeal, that he was not the procuring cause in the case of Edwards Way. Nor did he err in holding Wahby to have been the procuring cause in the case of Edwards Way. The testimony justified judgments against Vance and Willowbrook for commissions at the rate of 5% of the sales price. *Sanders v. Devereux*, 231 Md. 224; *Cowal v. Marletta*, 216 Md. 222; *Steele v. Seth*, 211 Md. 323; *Heslop v. Dieudonne*, 209 Md. 201; *Clark v. Banks*, 158 Md. 24; *Zetlin v. Scher*, 241 Md. 590, 595. Also see *Leimbach v. Nicholson*, 219 Md. 440.

We are not persuaded that it was either legally permissible or appropriate to hold Damazo personally liable for the commissions. Damazo always used a corporation to hold title to and operate a property he bought. Both Vance and Willowbrook were fully formed and legally existing corporate entities in good standing. Although their capitalizations were small, each corporation owned substantial assets in its own right and each maintained its own financial records. The stock of each was fully issued and separate minutes books were kept. Damazo recognized, respected and used the corporate entities as such. Those who dealt with Damazo knew this and knew that corporations owned the properties. The exclusive listing agreement Wahby obtained was executed for Vance and Willowbrook expressly by Damazo as president and Wahby's subsequent agency was based on an extension of that agreement.

The general rule is that shareholders are not held liable for debts or obligations of the corporation except where it is necessary to prevent fraud or enforce a paramount equity. Brune, *Maryland Corporation Law and Practice* § 371 (rev. ed. 1953). The fact that Damazo controlled and operated the corporations would not of itself justify piercing the corporate veil or make him liable for that which the corporations owed. *Ace Development Co. v.*

*Harrison,* 196 Md. 357, 367, held that agents of a corporation are individually liable,

> "if they use a corporation for the deliberate purpose of making a contract for it, when at the time they intend to defraud a party thereto, and the contract is merely an avenue on which the fraud operates, * * * [and that] the burden of proof is on the one charging fraud to establish by clear, specific acts, facts that in law constitute fraud."

See *Carozza v. Federal Finance Co.,* 149 Md. 223; *Ex Parte Garey,* 202 Md. 11; *Obre v. Alban Tractor Co.,* 228 Md. 291; *Adler v. Walker & Dunlop,* 245 Md. 153; *McAuliffe v. C and K Builders* (D.C. Mun. App.), 142 A. 2d 605.

There is no evidence that at the time the real estate agency contracts were made Damazo used or intended to use the corporations as instruments to perpetrate a fraud. Nor is there evidence that the separate identities of Damazo and the corporations were not recognized and observed. For example, the deeds from Vance and Willowbrook were corporate deeds containing certifications that they were executed and delivered pursuant to a resolution of the board of directors and the stockholders. All three directors of Vance and Willowbrook were present when the deeds were executed (Damazo, his wife and a lawyer named Ritterpusch). Wahby and Fliegel had previously dealt with other corporations owned and controlled by Damazo and on each occasion had been paid the commissions due.

As the Court said in *Carozza v. Federal Finance Co., supra,* p. 239:

> "The status of the * * * [c]orporation was that of a going, functioning corporate entity and our conclusion on the record is that, so accepting it, the appellees contracted with the corporation; *qua* corporation; and that the legal relation

arising out of and implicit in the contractual obligation of the corporate obligors cannot now be changed to the status of a contract between an individual and a corporation."

Recognition that the corporate identities must be honored will not necessarily prevent Wahby and Fliegel from pursuing any assets, including the notes secured by the second deeds of trust, which went from the corporations to Damazo and his wife. The *bona fides* and effectiveness of the assignments of corporate assets to stockholders may be inquired into and resolved in favor of creditors of the corporation if the assignments were fraudulent as to the creditors or if their equities are superior to those of the stockholders.

"As against creditors, a conveyance of corporate property to an individual stockholder * * * is invalid and may be set aside. * * * [The cases so holding] affirm rather than disregard the corporate entity and represent the application of ordinary principles of the law of fraudulent conveyances." Brune, *op. cit.* § 371, p. 436.

See *Mundy v. Jacques,* 116 Md. 11, 17.

We turn to the tort judgments. In respect of the counts of the declarations alleging tortious interference with the contractual rights to commissions of the respective brokers, Judge Shearin said:

"that cause of action has been proved by a fair preponderance of the evidence; that the direct evidence, the circumstantial evidence and the inferences to be drawn from both warrant the Court in concluding that the * * * defendants named in that count jointly and severally combined to defeat the [rights] of [Fliegel and Wahby] to [real estate commissions on the properties] in question. * * *

"Accordingly, the Court enters judgment"

in favor of Fliegel for $1.00 compensatory damages and $5,000 punitive damages against John L. Toth, Irene Toth and David Damazo. Judge Shearin continued:

> "In respect of Count 6 of the plaintiff Fliegel's declaration alleging a conspiracy between the same three defendants the Court finds that the facts and the evidence before it warrant a finding that these defendants did so conspire and awards a judgment against said three defendants in the amount of $1.00 compensatory damage.
>
> "In view of the punitive damages awarded under Count 5, the Court does not feel it appropriate to impose further punitive damages under Count 6 and regards in practical effect the commission of the tort described in Count 5 to be a result of and in furtherance of the conspiracy described in Count 6. So for the purposes of punitive damages, the Court has treated those two counts as one.
>
>          \* \* \*
>
> "Under Count 4 of the Wahby declaration [the conspiracy count] the Court awards the plaintiff judgment against David Damazo, John L. Toth, Irene Toth and Robert L. Taylor, respectively, for the sum of $1.00 compensatory damages, and, for the same reasons previously assigned as to the Fliegel case, refrains from awarding any further punitive damages for that purpose regarding Counts 3 and 4 as one."

Appellants urge that it was error to have awarded judgment against Damazo for tortious interference with Wahby's contract because (1) Wahby's declaration did not allege that Damazo so interfered and did not seek a judgment against Damazo on that score and (2) the appellees claim and the court's verdict was that Damazo individually contracted to pay commissions and one cannot tortiously interfere with his own contract.

The basis for the second contention disappears with our holding that the contracts were between the corporations and the brokers, assuming for the purpose of the case, as some authorities hold, that one cannot tortiously interfere with the performance of his own contract.[1]

It is true that Wahby did not plead or seek damages against Damazo for tortious interference but in light of Judge Shearin's treatment and disposition of the interference counts and the conspiracy counts this becomes immaterial in the view we take and the disposition we will make of the case.

We think there was ample evidence to support Judge Shearin's findings of conspiracy to deprive Wahby and Fliegel of the commissions they had earned with resulting damages, and that the tort of conspiracy was, under the circumstances, so nearly equivalent to the tort of illegal interference with contract as to justify Judge Shearin treating the two torts as one. We think, however, that an erroneous and impermissible measure of damages was applied by Judge Shearin.

The rules that control the torts of interference with and conspiracy to interfere with a contract right were spelled out by Judge Henderson for the Court in *Horn v. Seth,* 201 Md. 589, 594, 597. There this Court upheld a judgment against a broker for tortious interference with another broker's earned contract right to a commission. The opinion said:

> "We think there was evidence from which the jury might properly find that Seth had earned his commission when he procured a purchaser who was ready, willing and able to take the property at the price offered."

Some States have held that because the disappointed broker can recover judgment for his earned commission

---

1. Prosser, The Law of Torts § 123, p. 958 (3rd ed. 1964); Canister Co. v. National Can Corp. (D. Del.), 96 F. Supp. 273; Allison v. American Airlines (N. D. Okla.), 112 F. Supp. 37; Hein v. Chrysler Corporation (Wash.), 277 P. 2d 708, 714.

against the seller he has suffered no damage, and since damage is the gist of the action, cannot recover in tort. *Horn v. Seth* rejected that view and added:

"The rule that in a civil action based on conspiracy damage is the gist of the action seems to have been recognized in Maryland. *Kimball v. Harman,* 34 Md. 407, 411. If not the gist of the action, it is at least an essential element of the tort. *Edison Realty Co. v. Bauernschub,* 191 Md. 451, 461 * * *; *Rent-a-Car Co. v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 260 * * *. We are not dealing with conspiracy in the instant case, but the tort of interference is somewhat analogous, and we may assume that proof of some damage would be prerequisite to recovery."

The Court went on to hold that at least nominal damages would be recoverable (although the judgment affirmed was essentially for actual damages) because a judgment against the seller might not be collectible and because the broker had been put to the trouble and expense of suing someone to recover his commission. *Robertson v. Parks,* 76 Md. 118, 135, made clear that the basis of conspiracy as a civil action is the doing of something which would give a right of action without the conspiracy, and that the damage done is the gist of the action, not the conspiracy in the abstract, although the conspiracy may enhance damages.

The Maryland rule is that malice in the sense of deliberate and improper violation of a known right, that is, absence of legal justification, will support an action and permit recovery of compensatory damages for deprivation of known contractual rights but that actual malice must be shown to support punitive damages. *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556; *Stannard v. McCool,* 198 Md. 609; *Heinze v. Murphy,* 180 Md. 423. There is no evidence here to show more than that Damazo wanted to benefit himself by receiving the gross purchase

price without diminution for commissions and the various purchasers wanted to pay a lesser purchase price that the avoidance of the earned commissions would permit. As the Court said in the *Knickerbocker* case at pp. 569-570 of 107 Md., exemplary damages may be recoverable in cases of this character,

> "if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it. Unless there was injury to the plaintiff by the act of the defendant, no action would lie, and therefore such action must be based on injury."

The case before us differs from *Rinaldi v. Tana*, 252 Md. 544, in which we approved the imposition of punitive damages for tortious interference with contract rights. There, although the per curiam opinion does not reveal it, there was testimony in the record that the interferer had expressed animosity towards his sister with whose contract he interfered and had threatened and indicated a determined purpose to harm her. Judge Moore, the trial judge, found this brought the case within the holding of the *Knickerbocker* case on punitive damages.

It is apparent that the trial court considered Damazo as the chief instrument of harm to the brokers and the one who could be made to be financially responsible in actuality. The judgments Judge Shearin rendered reflect this, and it is obvious that if Judge Shearin had realized (1) that Damazo could not be held personally and directly responsible to pay the brokers their commissions under the contract counts of the declaration, (2) that he

could not be held liable at all under the interference count of Wahby's declaration, (3) that he could not be held liable for punitive damages under the interference and conspiracy counts for lack of evidence of express malice, and (4) that for the same reason the Toths and Taylor could not be held liable for punitive damages under either the interference or conspiracy counts, the judgments he would have rendered properly and permissively could have appropriately reflected the amount of enforceable responsibility he found the evidence to place on Damazo, the Toths and Taylor, respectively, under the various counts. The judgments against Damazo under the contract counts cannot stand and neither can the judgments for punitive damages against Damazo, the Toths and Taylor. For the reasons we have indicated, we think the interests of justice will best be served if the case is neither affirmed nor reversed. It will be remanded under Maryland Rule 871 a without affirmance or reversal for further proceedings consistent with the views we have expressed.

The remand without affirmance or reversal will vacate all the judgments, except those against Willowbrook and Vance, which will remain undisturbed. The new judgments that will be entered should reflect the collectibility of the judgments against the corporations, perhaps by being entered for the amount of the commissions claimed with credit to be given for any amount recovered on the judgments against the corporations, since only one recovery of the actual damages can be allowed.

> *Case remanded without affirmance or reversal under Maryland Rule 871 a for further proceedings and the rendering of new judgments consistent with the views and holdings of the opinion herein, costs to be paid by appellants.*