# LAKE SHORE INVESTORS *v.* RITE AID CORPORATION ET AL.

[No. 1494, September Term, 1982.]

*Decided June 14, 1983.*

The cause was argued before GILBERT, C. J., and WILNER and GETTY, JJ.

*Shale D. Stiller* and *Robert B. Levin,* with whom were *Frank, Bernstein, Conaway & Goldman* on the brief, for appellant.

*Stephen K. Fedder,* with whom were *Marvin J. Land, Judith C. Levinson* and *Weinberg & Green* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

For the last seventy-five years it has been clear that one who wrongfully interferes with the contractual rights of another is liable to the injured party in an action of tort. *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405 (1908).[1] What is not so clear is by what standard damages arising from that interference are to be measured.

1. *See* Sumwalt Ice and Coal Co. v. Knickerbocker Ice Co., 114 Md. 403, 80 A. 48 (1911); Cumberland Glass Manufacturing Co. v. DeWitt, 120 Md. 381, 87 A. 927 (1913); Goldman v. Harford Road Building Association, 150 Md. 677, 133 A. 843 (1926); Stannard v. McCool, 198 Md. 609, 84 A.2d 862 (1951); Damazo v. Wahby, 259 Md. 627, 270 A.2d 814 (1970); Daugherty v. Kessler, 264 Md. 281, 286 A.2d 95 (1972). *See also* Angle v. Chicago S. P., M. & O. R. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55 (1894).

We are called upon in this case to decide whether these damages are in contract or in tort.

### The Facts

Lake Shore Investors (LSI), a limited partnership, was formed for the purpose of acquiring lands in the Lake Shore area of Anne Arundel County and erecting and operating a shopping center to be known as Lake Shore Plaza. A fifteen acre tract was purchased by LSI in 1975 for $509,000. Settlement, however, did not occur until two years later. In 1978, LSI acquired an additional fifteen acre tract at an auction sale for a bid of $100,000. That property was located across the road from the first obtained parcel. The original fifteen acres were described as being "flatter and better suited for development, while the second tract was hilly and marshy." After the acquisition of the second tract, LSI began to develop the first parcel as a shopping center, and in furtherance of that goal it entered into a lease with Safeway Supermarket Company. Safeway, we are told, was to be an "anchor tenant." LSI also negotiated with Read's, Inc., the predecessor of Rite Aid Corporation. It was proposed that Read's would lease 12,000 square feet of space next to the Safeway. Such a "Lease" between Read's and LSI was signed, but it was subject to agreement on certain plans and specifications for construction of the store. No agreement as to these plans and specifications was apparently ever reached.

Rite Aid, in April, 1977, entered upon the scene as successor to Read's. At that time John Schmitt, a Rite Aid executive, informed LSI that Rite Aid did not want to lease 12,000 square feet but would lease 8,000 square feet. That figure was subsequently reduced by Rite Aid to 6,000 square feet. When that proposal was rejected, Rite Aid countered with the proposition that it lease the 12,000 square feet, but that it be allowed to sublease 6,000 square feet from that space. LSI rejected the Rite Aid suggestion. LSI, however, offered Rite Aid 6,000 square feet of space at the opposite end

of the shopping center, but Rite Aid insisted on being next door to the Safeway. According to the testimony produced by LSI, Rite Aid and LSI severed negotiations and went their "different ways." No further contact was had between Rite Aid and LSI for some two years, until January, 1979.

During the interim, LSI entered into a lease for approximately 17,000 square feet with Drug Fair, Inc. That transaction was reported in a trade journal. In January, 1979, Robert E. Statkiewicz, a partner in LSI, encountered John Schmitt at a shopping center seminar in New Orleans. A "red-faced" Schmitt allegedly told Statkiewicz that he, Schmitt, was very upset over LSI's leasing space to Drug Fair in Lake Shore Plaza. Schmitt allegedly said that Randy White, another LSI partner who was the person who attempted to negotiate the lease with Rite Aid, was "going to be sorry." According to Statkiewicz, Schmitt said that, "we'll fix him."

Charles Slane of Rite Aid wrote to LSI in March, 1979, advising that he had read an article in a trade publication in which it was reported that LSI planned a ground breaking in the Spring of 1979. Slane threatened litigation unless LSI agreed to build Rite Aid a store in the shopping center. LSI responded that no lease existed between it and Rite Aid.

Finding itself short of funds required to finish the project, LSI, on August 31, 1979, agreed to sell the entire thirty acre property to BTR Realty, Inc. (BTR), for $900,000 cash. Additionally, BTR agreed to purchase a $66,000 certificate of deposit that LSI had pledged to New York Life Insurance Company as a "commitment fee" on the mortgage that New York Life was to carry on the property. BTR's counsel learned of the Slane letter written in March, 1979, on behalf of Rite Aid in which it threatened litigation. BTR insisted upon a clause in its purchase agreement with LSI to the effect that BTR could withdraw from that agreement if LSI could not furnish BTR with a written release from Rite Aid. Obviously, BTR was not interested in purchasing litigation.

Drug Fair's corporate counsel, Robert N. Weinstock, was contacted by Franklin Brown of Rite Aid. Brown allegedly

told Weinstock in an "intimidating" tone of voice that Drug Fair could either yield its lease or be in the same shopping center with Rite Aid. Brown, according to Weinstock, said that Drug Fair's plan to be the only drug store in the shopping center "was not about to happen." In reply to telephone calls from BTR's lawyer, Brown remained insistent that Rite Aid had a valid lease with LSI.

The upshot of Rite Aid's refusal to release BTR and LSI from any claim against the property resulted in BTR's withdrawal from its agreement with LSI.

LSI, in November, 1979, sued Rite Aid Corporation and Rite Aid of Maryland, Inc. (Rite Aid), in the Circuit Court for Baltimore City [2] for unlawful interference in LSI's contractual relationship with BTR. LSI asserted that it was entitled to $25,000,000 in damages.

While the suit was pending, LSI sold the original tract to St. John/Litty for $840,650, but LSI retained ownership of the secondly acquired fifteen acre parcel.

At trial LSI claimed "out of pocket" damages, accounting from October 1, 1979, as follows:

### "OUT-OF-POCKET DAMAGES

| | |
|---|---|
| Interest expenses on mortgages and loans which would have been paid in full at BTR settlement* | $293,351.50 |
| Real Estate Taxes and County Assessments against the property since 10/2/79 | 23,560.40 |
| Insurance on the property since 10/2/79 | 816.95 |

---

**2.** The suit was originally filed in the Court of Common Pleas. As a result of a constitutional amendment, all of the courts of the "Supreme Bench of Baltimore City" became consolidated into the current Circuit Court for Baltimore City.

Architectural, engineering,
   leasing and management expenses
   on the property since 10/2/79      44,360.96

TOTAL OUT-OF-POCKET
DAMAGES                  $362,089.81

*does not include mortgage interest expense and real estate taxes since 4/1/82"

The trial judge refused to admit evidence of "out-of-pocket damages," ruling instead that the measure of damages was the contractual "benefit of the bargain rule." The judge defined "benefit of the bargain" to mean the difference between the fair market value of the property at the time of Rite Aid's interference with the BTR contract and the contractual price of $900,000.

LSI calculated its loss under the "benefit of bargain" rule in the following manner:

### "LOSS ON SALE OF PROPERTY

| | | |
|---|---:|---:|
| Total consideration on BTR contract | $966,000 | |
| Less sellers' settlement expenses | 6,325 | |
|    Net proceeds on BTR sale | | $959,675 |
| Total consideration on St. John/Litty contract* | 850,000 | |
| Less sellers' settlement expenses | 9,350 | |
|    Net proceeds on St. John/Litty | | 840,650 |
| Difference on two contracts | | $119,025 |
| Less unsold land | | 100,000 |
| Net Loss | | $ 19,025 |

*does not include mortgage interest expense and real estate taxes since 4/1/82 which are responsibility of St. John/Litty under the terms of their contract."

Those damages, however, were never introduced into evidence.

Prior to trial Rite Aid sought summary judgment on the ground that it had a valid lease with LSI. The latter filed a cross-motion for similar relief. Rite Aid has appealed the denial of its motion.

## The Issues

I. Are damages in an unlawful interference with contract cases measured by tort or contract precepts?

II. Did the appellant waive its appeal in failing to submit evidence under the trial judge's "benefit of bargain" damage theory?

III. Did the trial court err in denying Rite Aid's motion for summary judgment and in granting LSI's similar motion.

## I.

### Interference with Contractual Relationship

The tort of interference with contractual relations was first recognized in this State in *Knickerbocker Ice Co. v. Gardiner Dairy Co., supra.* The Court of Appeals said, at 569:

> "In a suit between the parties to a contract the general rule is that whether it be an action *ex contractu,* or an action of tort, founded on the breach of contract, the measure of damages is the same and under the control of the Court."

Rite Aid reads *Knickerbocker* to hold that in cases of interference with the contractual rights of another that the damages are to be measured in the same manner as a breach of contract. That, however, is not what *Knickerbocker* says. The key words of the above quotation from *Knickerbocker* are: "In a suit between the parties to a contract. . . ." Patently, Rite Aid was not a party to the contract in the instant case and the general rule laid down by *Knickerbocker* in the quoted passage is simply not applicable.

*Knickerbocker* involved a suit by Gardiner Dairy Company against Knickerbocker. Gardiner alleged that it was engaged in the dairy business and was required to buy large quantities of ice during the summer months. It contracted with Sumwalt Ice and Coal Company whereby Sumwalt would deliver 20 tons of ice each day to Gardiner at a cost of $5 per ton. At that time Sumwalt was purchasing ice from Knickerbocker which was engaged in the business of manufacturing ice. Knickerbocker advised Sumwalt that unless it stopped delivering ice to Gardiner, Knickerbocker would cease selling ice to Sumwalt. Because Sumwalt's ice business depended upon supplies from Knickerbocker, it was compelled to break its contract with Gardiner.

The Court, speaking through Chief Judge Boyd, said:

"It may be safely said that if wrongful or unlawful means are employed to induce a breach of contract, and injury ensues, the party so causing the breach is liable in an action in tort." 107 Md. at 566.

Writing on the subject of interference with contractual relationship, Professor William L. Prosser, in *Handbook of the Law of Torts* (4th ed. 1971), § 129 states that the tort stems from "very ancient times." It was incorporated into Roman law and by the Thirteenth Century "had been taken over by the common law." The tort first appears, Prosser says, "in definite form in 1853" in a case entitled, *Lumley v. Gye,* 2 El. & Bl. 216, 118 Eng. Rep. 749. The facts of that case were that Miss Wagner, an opera singer of some renown, was under a contract to sing for the plaintiff. The defendant, fully aware of the contract and "maliciously intending to injure the plaintiff," lured Miss Wagner into refusing to abide by her agreement with the plaintiff. A divided court allowed damages to the plaintiff.

American courts, according to Prosser, were reluctant to follow the English precedents. Eventually, the American courts recognized the tort of interference with a contract. Now, however, the cause of action is perceived as a tort "virtually everywhere."

By its nature, wilful interference with the contractual rights of another is usually an intentional tort.[3]

Damages in cases of interference with contractual relationships are generally awarded on the basis of one of three methods:

1. *The contract method.* This method limits recovery to the damages within the contemplation of the original contracting parties.

2. *A tort standard.* Such a measure limits damages to those which are "proximate" to the injury about which complaint is made. Prosser describes this method as analogous to damages determined by rule of "negligent torts." *Law of Torts,* § 129, p. 948-949.

3. *An intentional tort.* This method of determining damages permits recovery for unforeseen expenses, mental suffering and damage to reputation, in addition to punitive damages.

*See generally* Prosser, *Law of Torts* (4th ed. 1971) § 129, n. 43 through n. 50.

We agree with Prosser's observation that, "[i]n the light of the intent and the lack of justification necessary to the tort . . . [the third method affords] the most consistent result." (4th ed. 1971) § 129, p. 949. We think the contract method appears to allow inadequate damages. If a subsequent sale showed no loss, or at best a minimum loss, the plaintiff would be left without a remedy at law. The tortfeasor would, be able to accomplish his objective and yet remain, for all practical purposes, immune from having to pay damages.

*Knickerbocker* makes perspicuous that if the evidence demonstrates that a defendant has caused a contract to be broken "for the sole purpose, and with the deliberate inten-

---

**3.** There is an exception. One who *negligently* injures a servant becomes liable to the master for loss of services. That exception appears to apply more in England than in this country and even in the former has "been under considerable attack of late." Prosser, *Law of Torts* (4th ed. 1971) §129, p. 938.

tion of wrongfully injuring the plaintiff, exemplary damages might be recovered . . . ." 107 Md. at 569. *See also Damazo v. Wahby,* 259 Md. 627, 270 A.2d 814 (1970); *Rinaldi v. Tana,* 252 Md. 544, 250 A.2d 533 (1969). *Knickerbocker* and its siblings declare that wilful interference with the contractual rights of another is a tort for which exemplary or punitive damages may be awarded.

To support the contractual damages theory, the trial court relied upon *Kasten Construction Company, Inc. v. Jolles,* 262 Md. 527, 278 A.2d 48 (1971). There the Court made crystalline that, "the measure of damages when a vendee breaches a contract to purchase real estate is the difference between the contract price and the fair market value at the time of the breach." We have no quarrel with the rule announced in *Kasten.* We do, however, think that it was misapplied in the matter *sub judice. Kasten* was concerned with a breach of contract between the parties; it did not purport to deal with matters involving tortious interference with the contractual rights of third parties. Damages in a case of breach of contract by a party to the contract are clearly measured by the *Kasten* standard. On the other hand, Maryland case law makes manifest that interference with the contractual right of another is a tort, not a breach of contract. *See e.g., Knickerbocker Ice Co. v. Gardiner Dairy Co., supra; Cumberland Glass Mnf'g Co. v. DeWitt, supra; Goldman v. Harford Road Building Assn., supra; Stannard v. McCool, supra; Horn v. Seth,* 201 Md. 589, 95 A.2d 312 (1953); *McGinnis v. Chance,* 247 Md. 393, 231 A.2d 63 (1967); *Rinaldi v. Tana, supra; Damazo v. Wahby, supra; St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.,* 262 Md. 192, 278 A.2d 12 (1971); *Daugherty v. Kessler, supra; H & R Block v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975).

A contract can only impose obligation upon those who are parties to it. Third persons, however, are under a duty not to interfere with the performance of the contract by the parties to it without lawful justification. *Goldman v. Building Assn.,* 150 Md. at 681.

The tort of interference with a contractual relationship does not grow out of the contract but is separate and apart. Of course, it is necessary to show that a contract exists between two or more parties and that the defendant wrongfully, without justification, interfered with that contract so as to bring about a breach to the detriment of the one or more parties thereto. That does not mean that the injured party is limited in his or its proof of damages to those arising directly from the breach occasioned by the interference. It is the successful interference that is the tort, not the breach of the contract.[4] The latter is but proof of the former.

There was evidence before the trial court from which one could reasonably infer that Rite Aid deliberately and wilfully interfered with LSI's contractual relationship with BTR,[5] and that the interference was purposely done in order to injure LSI.

Based on that evidence, if the jury were to find any amount of compensatory damages, it might assess punitive damages, *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 446, 340 A.2d 705 (1975) (and cases cited therein), in such sum as would dissuade future acts of interference by the tortfeasor.

With respect to punitive damages in torts of contractual interference, Chief Judge Hammond penned for the Court of Appeals in *Damazo v. Wahby,* 259 Md. at 638:

> "The Maryland rule is that malice in its sense of deliberate and improper violation of a known right, that is, absence of legal justification, will support an action and permit recovery of compensatory damages for deprivation of known contractual rights, but that actual malice must be shown to support punitive damages."

---

**4.** Whether an unsuccessful interference gives rise to a cause of action is not an issue, and we do not decide it.

**5.** From the record one may conclude that Rite Aid made contact with Drug Fair in an effort to dissuade Drug Fair's going into the Lake Shore Plaza shopping center. That action by Rite Aid is not the basis of the suit. Whether such conduct is tortious interference is not before us.

*See also Knickerbocker Ice Co. v. Gardiner Dairy Co., supra; Rinaldi v. Tana, supra; Stannard v. McCool, supra; Heinze v. Murphy,* 180 Md. 423 (1942).

We hold that the trial court erred in limiting the evidence of damages to the "benefit of bargain." LSI should have been permitted to prove such damages as would reasonably flow from the tortious contractual interference by Rite Aid.

## II.

### Damages

As we have previously observed, LSI proffered evidence of damages stemming from the contractual interference. They declined the judge's invitation to submit evidence under the "benefit of bargain" theory and, therefore, subjected themselves to the entry of a directed verdict against them.

At that time, LSI was put to the choice of going forward and introducing damages under the "benefit of bargain" theory or suffering the entry of a directed verdict in favor of Rite Aid. Had LSI gone forward the trial court might have determined that they had waived any other theory and thus they had, for practical purposes on appeal, slammed the door in their own face. Instead, LSI chose to engage in a strategic withdrawal so that it might "live to fight another day." [6]

LSI's submission to the directed verdict did not waive the issue on appeal.

---

**6.** Oliver Goldsmith (1728-1774), *The Art of Poetry on a New Plan* (1761), wrote:

"For he who fights and runs away
May live to fight another day;
But he who is in battle slain
Can never rise and fight again."

### III.

#### *Cross-Appeal—Partial Summary Judgment*

Rite Aid asserts that the trial court should have granted its motion for summary judgment which was predicated upon its having a valid lease with LSI. Rite Aid argues that even if it be decided that the trial court was correct in denying its motion for summary judgment, the court was incorrect in entering a judgment on behalf of LSI because entry of judgment was prevented by the presence of a genuine dispute of a material fact.

Had Rite Aid a valid lease with LSI, the interference with LSI's contractual relationship with BTR would have been grounded upon that fact, thus affording Rite Aid the defense of justification of protecting its lease.

As we observed at the outset, the lease between Rite Aid, as successor to Read's, and LSI was subject to agreement on plans and specifications. No agreement with respect thereto was ever reached by the parties. John Schmitt, on behalf of Rite Aid, endeavored to reduce the number of square feet that Rite Aid would occupy. According to the evidence offered by LSI, the parties eventually "agreed to disagree" and went their "different ways."

In *People's Drug Stores v. Fenton,* 191 Md. 489, 62 A.2d 273 (1948), the Court rejected an effort by People's Drug Stores to enforce specifically a lease of a store that "was to be built in accordance with plans and specifications to be approved . . . but no plans and specifications . . . [were ever] submitted."

Patently, in the case at bar, if the plans and specifications were not decided upon, an essential element of the lease was missing. Without that element, there was no binding lease. Without a binding lease, Rite Aid had no basis for its claim. Consequently, the hearing court correctly declined to enter a summary judgment in favor of Rite Aid. Contrary to the way Rite Aid views the matter, the parties had not agreed on all material terms of the lease, else they would have agreed on the plans and specifications.

We think that the trial court was correct in granting LSI's motion for summary judgment because there was no barrier in the form of a genuine dispute of a material fact so as to preclude the entry.

*Judgment in favor of Rite Aid Corporation et al., reversed; summary judgment in favor of Lake Shore Investors, affirmed.*
*Case remanded for a new trial.*
*Costs to be paid by appellees-cross-appellants.*