ST. PAUL AT CHASE CORPORATION ET AL. *v.*
THE MANUFACTURERS LIFE INSURANCE
COMPANY ET AL.

[No. 400, September Term, 1970.]

*Decided May 17, 1971.*

*Motion for modification and rehearing filed May 26, 1971; denied June 1, 1971. Supplemental motion for modification and for rehearing filed June 14, 1971, motions for rehearing filed by Manufacturers Life Insurance Co. and Weaver Bros., Inc. of Maryland on June 15 and 16, 1971; motions denied June 24, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*David Freishtat,* with whom were *Charles W. Williams* and *Cornelius V. Roe* on the brief, for appellants and cross-appellees.

*Richard W. Case,* with whom were *Joseph M. Roulhac, Michael A. Pretl* and *Smith, Somerville & Case* on the brief, for appellees and cross-appellants The Manufacturers Life Insurance Company and Weaver Bros., Inc.

*George W. Baker, Jr.,* with whom were *Allen, Burch & Baker* on the brief, for cross-appellees The Mullan Contracting Company and Real Estate Management Co., Inc.

SMITH, J., delivered the opinion of the Court.

The trial judge in this case (Proctor, J.) prefaced his findings of fact (the delivery of which consumed a full court day and which took up over 50 pages of the record extract) with the comment:

> "In the past, I have looked upon St. Paul as a great Christian apostle. However, from here on I'm very much afraid that to me it will mean a high-rise apartment building at the corner of St. Paul at Chase."

The apartment house was the dream of appellant Charles W. Williams. As his literature put it, he conceived of it as a "prestige address" intended for "Gracious In-town Living". Appellant St. Paul at Chase Corporation was formed for the purpose of erecting and operating the building. This litigation was produced when

Manufacturers Life Insurance Co. of Toronto, Canada, cancelled a commitment it had made for permanent financing of the apartment building.

The situation here can perhaps best be understood by reference to the cast of characters:

St. Paul at Chase Corporation (St. Paul) — plaintiff below, and appellant and cross-appellee here; received judgment of $1,935,955.60 at trial below; this is the company which was developing the apartment project in question.

Charles W. Williams (Williams) — president and principal stockholder of St. Paul.

W. Hamilton Whiteford (Whiteford) and Edward A. Johnston (Johnston) — attorneys for St. Paul.

The Manufacturers Life Insurance Company (Manufacturers) — defendant below, and appellee and cross-appellant here; Canadian insurance company which was to provide a $4,800,000 permanent mortgage to St. Paul.

Thomas R. Lamon (Lamon)—mortgage superintendent for Manufacturers.

Donald W. Lambert (Lambert)—assistant mortgage superintendent for the United States for Manufacturers.

Weaver Bros., Inc. (Weaver Bros. or Weaver)—defendant below and appellee and cross-appellant here; retained by St. Paul to procure financing for the project.

Sidney H. Tinley, Jr. (Tinley) — senior vice-president of Weaver Bros.

E. Catherine Byrne Doehler (Miss Byrne) — another vice-president.

The Mullan Contracting Company (Mullan Contracting)—general contractor for the project.

Charles A. Mullan (Mullan)—president of Mullan Contracting.

Chemical Bank New York Trust Company (Chemical) —New York bank which eventually made $4,-800,000 construction loan (not the permanent mortgage) for the project; not a party to this suit, but party to federal suit now pending and awaiting outcome of this suit.

Merchants Mortgage Company (Merchants) — another mortgage broker, which eventually procured the construction loan from Chemical.

Ralph Lubow (Lubow) — loan officer of Merchants.

Daniel A. Neumayer (Neumayer)—architect for the project.

Corbin C. Cogswell (Cogswell) of The Cogswell Construction Company—inspector for Weaver Bros. and Manufacturers.

Merritt & Harris—inspector for Chemical.

Williams and St. Paul sued Manufacturers and Weaver Bros. As Williams put it in his brief:

"Upon Defendants' Motion to Dismiss, Williams' individual claims against Manufacturers and Weaver were dismissed. However, as Williams is personally liable to Chemical for Chemical's Deficiency Decree, until this entire matter is resolved, Williams is an interested party and as such is a Party Plaintiff, see *Newark Trust Co. v. Talbot Bank,* 217 Md. 141 (1958)."

The exact breakdown of the judgments against Weaver Bros. and Manufacturers will be set forth later. St. Paul believes these judgments to be inadequate while Weaver Bros. and Manufacturers are convinced they had no liability. Therefore, they have all appealed. We shall affirm as to liability, eliminate punitive damages, and remand the case for entry of judgments which increase somewhat—but not to the extent desired by St. Paul — the compensatory damages.

Mullan Contracting and Real Estate Management Co.,

Inc., are use plaintiffs in the litigation and appear here as cross-appellees, being owed in excess of $300,000 by St. Paul.

The six counts in the declaration were summarized by the trial judge as follows:

"COUNT 1 OF THE DECLARATION

"Although it is long and verbose, the gravamen of this count is that Weaver breached its contract of December 6, 1963, with the Plaintiff. * * * [(Probably the gist of this count is contained in paragraphs 40 and 41 of the declaration which stated:

"40. The Plaintiffs allege that having accepted the above modifications of Weaver's offer, they then waited for more than a reasonable time for Defendant Weaver to provide them with a construction loan, as Defendant Weaver had promised to do. The Plaintiffs allege that it was only after Defendant Weaver had attempted to secure their property for another client and only after Tinley, as Executive Vice-President of Defendant Weaver, had advised Plaintiffs' counsel, that Defendant Weaver had spent entirely too much time, that the Plaintiffs with their entire project then in jeopardy, advised Defendant Weaver on December 6, 1963, that the Plaintiffs were placing their construction loan elsewhere. The Plaintiffs allege that with their entire project then in jeopardy, under the time limitation set by Defendant Manufacturers in their Letter of Commitment of June 7, 1963, the Plaintiffs were required to do all in their power and regardless of the expense involved to obtain a construction loan from another source in an attempt to avoid the heavy losses and damages with which they were faced.

"41. The Plaintiffs allege that in spite of the modifications to Defendant Weaver's original offer and contract agreed to by Plaintiffs in an effort to assist Defendant Weaver, Defendant Weaver did not secure a construction loan for the Plaintiffs by September 1, 1963, as they had promised and bargained to do, did not secure a construction loan for the Plaintiffs within a reasonable time thereafter, and in fact never did secure a construction loan for the Plaintiffs. The Plaintiffs allege that the failure of Defendant Weaver to secure a construction loan for the Plaintiffs as they had promised and bargained to do delayed the start and hence the completion of the Plaintiffs project by many months. The Plaintiffs allege that this failure on the part of Weaver to furnish the Plaintiffs a construction loan by September 1, 1963, and thereafter within a reasonable time, contributed to and set in motion those causes which caused the Plaintiffs their heavy losses and damage including the loss of their entire project."

It thus will be seen that the declaration itself did not refer to the December 6 agreement. This agreement supplanted the earlier agreement.)]

\* \* \*

"COUNT 2 OF THE DECLARATION

"This count sounds in tort and is based upon two alleged tortious actions by Weaver.

"First, Plaintiff contends that Weaver failed to process the Plans and Specifications promptly, and thus committed a tort. I have already found for Defendant Weaver on this point.

"Second, Plaintiff alleges negligent and deceitful conduct on the part of Weaver in failing to button up Manufacturers' offer of a construc-

tion mortgage loan, including Tinley's advice to Williams, when he accepted such offer, that it had been withdrawn. * * *

* * *

"COUNT 3 OF THE DECLARATION

"In this count Plaintiff contends that Manufacturers is responsible to it for breach of contract — Manufacturers' offer of June 7, 1963, and Plaintiff's acceptance of June 21, 1963. * * *

* * *

"COUNT 4 OF THE DECLARATION

"This is an action against Manufacturers in tort. It is based upon three contentions: (1) Alleged failure of Manufacturers to exercise good faith and alleged negligence in the processing and approval of plans and specifications. I have already rendered a verdict in favor of Manufacturers on this count. (2) Its alleged failure to exercise good faith in breaching the contract. (3) Alleged constructive fraud on its part in breaching the contract.

* * *

"COUNT 5 OF THE DECLARATION

"This is a contract action against Weaver to recover the $48,000 paid by Plaintiff to Weaver on May 11, 1964, as a finder's fee for obtaining the permanent mortgage loan commitment from Manufacturers. * * *

"COUNT 6 OF THE DECLARATION

"This is a tort action against Weaver and Manufacturers. It merely combines the allegations of Counts 2 and 4, and alleges that Defendants were joint tortfeasors. * * *"

St. Paul and Williams have summarized the request for damages and the actual award by the court as follows:

"St. Paul requested the following in damages:

| | | |
|---|---:|---:|
| A. Direct Damages—loss of property | | $ 7,920,00( |
| B. Special Damages—loss of business | | |
|    Value of Business | $7,265,000 | |
|    Less Amount of Mortgage | 4,800,000 | 2,465,00( |
| C. Consequential Damages— | | |
|   1. Chemical Bank—Deficiency Decree—2/27/67 | 1,297,952 | |
|   2. Extension fee paid Manufacturers 9/7/65 | 24,000 | |
|   3. Fee paid Weaver 9/18/63 on their loan of $480,000 | 9,600 | |
|   4. Interest on Weaver's loan of $480,000 from 9/18/63 to 1/1/65; paid 5/1/64 | 18,160 | |
|   5. Merchants Mortgage Co. fees and legal expenses | 85,500 | |
|   6. Dr. G. C. Merrill contract covering moving, interruption and dislocation of business, due over a 4 year period commencing with 4/1/66 | 50,000 | 1,485,21 |
| | | 11,870,21 |
| D. Interest from 5/15/66 to 2/15/70 | | 2,716,30( |
|    Total Compensatory Damages | | $14,586,51 |

"Under Count V, St. Paul claimed the return of the fee it paid to Weaver.
"THE COURT AWARDED:

| | Compensatory | Punitiv |
|---|---:|---:|
| COUNT I (Plaintiffs v. Weaver—Contract) | $ 5.00 | $ 50,00 |
| COUNT II (Plaintiffs v. Weaver—Tort) | 185,167.40 | 100,00 |
| COUNT III (Plaintiffs v. Mfgrs.—Contract) | 1,552,783.20 | —0— |
| COUNT IV (Plaintiffs v. Mfgrs.—Tort) | —0— | —0— |
| COUNT V (Plaintiffs v. Weaver—Contract) | 48,000.00 | —0— |
| COUNT VI (Plaintiffs v. Mfgrs. & Weaver jointly) | —0— | —0— |
| | $1,785,955.60 | $150,00 |

"No prejudgment interest was awarded except on the Chemical Deficiency Decree. The $1,552,783.20 above was awarded to cover the deficiency decree and included interest at 6%."

On appeal Williams and St. Paul raise four issues. The first three all deal with their dissatisfaction with the damages awarded. The fourth alleges error on the part of the trial court in denying a motion to amend by interlineation the damage clause of the declaration so as to materially increase the claim for compensatory damages

to approximately $14,000,000.00. We shall not be obliged to pass upon that point since the damages awarded are less than those claimed in the original declaration. They do not appeal the issue of the refusal of the trial court to enter judgment against Manufacturers under the fourth count of the declaration which was in tort, nor do they claim error on the part of the trial judge in not allowing punitive damages against Manufacturers.

Weaver Bros. alleged error in finding it liable at all, in entering judgment for punitive damages against it and in the amount of the judgment for compensatory damages. Manufacturers contests the judgment as to liability and the amount of damages awarded.

We shall summarize as briefly as possible the essential facts, adding some additional summation of facts under the points discussed.

Weaver Bros. is a mortgage broker. In *Hill v. Benevicz*, 224 Md. 79, 167 A. 2d 104 (1961), Chief Judge Brune discussed the practice of mortgage brokers and mortgage correspondents, stating:

> "Rouse's usual practice appears to be to submit applications to the F.H.A. for mortgage insurance in its own name, but to place the mortgage, when a commitment for insurance has been obtained, with one or another of the lending institutions for which it acts as mortgage correspondent, and which are themselves F.H.A. approved mortgagees. Rouse then takes the mortgage in its own name, assigns it to the lending institution and services the mortgage under a contract between Rouse and the lender, pursuant to which Rouse receives compensation. Rouse thus performs several functions in the transaction. It acts partly in its own interest, partly as agent for the lending institution and partly for the benefit of the prospective mortgagor and partly also for the benefit of the would-be seller, for without the mortgage fi-

nancing the sale probably would not produce the cash consideration which he is seeking. All of these functions are well known in the business, and there is no question of an agent secretly serving his own interest or the interest of one principal to the detriment of another." *Id.* at 84.

A chronology of major events is as follows:

August, 1962: Williams contracted the first of nine purchase options on land on the northeast corner of St. Paul and Chase Streets in Baltimore; total purchase price was to be $725,000; the options were to be exercised by June 15, 1963, with payment apparently to be made by September 1, 1963.

December, 1962: St. Paul was incorporated by Whiteford, with Williams as the sole stockholder.

March, 1963: Tinley heard that Williams was contemplating erection of a high-rise apartment and directed one of his subordinates to contact Williams, which was done.

March 25, 1963: Williams contacted Tinley about a possible $5,200,000 — $5,400,000 mortgage for the project.

April 10, 1963: Whiteford told Tinley that Williams needed 100% financing because he had no working capital.

May 14, 1963: Tinley advised Williams and Whiteford that Manufacturers was interested in a $4,800,000 permanent mortgage for 25-26 years at $6\frac{1}{4}$%. Weaver Bros. was to receive $48,000 for securing the permanent mortgage and another $48,000 for securing a $4,800,000 construction loan. St. Paul was also to pay Manufacturers a refundable "standby fee" of $48,000. Tinley said that Weaver Bros. would give a $200,000 second mortgage if Manufacturers' $4,800,000 mort-

gage was not enough. Williams wanted to act as his own general contractor on the project (without bond), with bonded sub-contractors.

May 29, 1963: Weaver Bros. made a written submission concerning the project to Manufacturers. The application was accompanied by Weaver's valuation of the property in the amount of $7,920,000 for land and building and $7,265,000 on the basis of capitalization at 7½% of the estimated net income of $544,865 per year. These figures, as will later be seen, contribute materially to this controversy.

June 5, 1963: Financing and plans for the project were approved by Manufacturers.

June 7, 1963: Commitment letter written by Manufacturers — it was for breach of this contract that the company was held liable at the trial below. In addition to interest on the loan, Manufacturers was to receive 13.31% of all gross rental income in excess of $721,044 (80% of the forecasted gross income). The offer was to be accepted by June 24, 1963.

June 14, 1963: Manufacturers' letter of commitment was discussed at a meeting, at which Tinley gave assurances that he would be able to secure the necessary construction loan by September 1, 1963. He also stated that the requirement of "satisfactory completion" of the building did not mean that the building had to be completed in every detail. Tinley made an offer of a $200,000 second mortgage for working capital purposes; the land options on the nine lots were exercised.

June 21, 1963: St. Paul accepted Manufacturers' offer and paid the $48,000 standby fee.

Late July or early August, 1963: Tinley telephoned Whiteford and told him Williams'

poor credit standing (because of business losses in Virginia) and his insistence upon acting as his own general contractor without bond were making it difficult to obtain a construction loan.

Early August, 1963: Tinley asked Lamon of Manufacturers if that company would be interested in financing the construction loan.

August 10, 1963: Williams met with Merchants, which offered a $4,800,000 construction loan of 6% if they could have 2-3 weeks for approval of the plans. Williams "tabled" this offer because he needed the money prior to September 1, 1963, and did not think that he could afford this time.

August 12, 1963: On or about this date, Lamon telephoned Tinley. He said that Manufacturers would make a construction loan commitment as follows: interest at 6%; a separate $24,000 fee; approval by Manufacturers of the final plans and specifications; and a bonded general contractor. Tinley passed this information on to Williams, who indicated he was upset because it ruled him out as his own general contractor, since he could not get a bond.

Late August, 1963: Tinley called Whiteford in Ocean City and told him that Weaver Bros. would procure a land mortgage loan for St. Paul in the amount of $480,000 so that the company could preserve its land options while ironing out the construction loan problems.

August 30, 1963: Letter from Weaver Bros. to St. Paul was delivered stating that Weaver Bros. was loaning $480,000 to St. Paul on land mortgage, that a $4,800,000 construction loan had been arranged, and that a $4,-800,000 permanent mortgage had been ar-

ranged. (There was some indication that this letter was written solely for the benefit of the holders of the nine lots in order to get them to grant an extension on the date of payment.)

Johnston (Whiteford's partner) took this letter around, and obtained extensions from the landowners until September 18, 1963.

Williams delivered a set of plans for the project to Weaver Bros. Weaver Bros. apparently considered them to be only preliminary plans; Mullan testified that they were permanent plans and that they had been used to secure the necessary building permits from Baltimore City.

September 5, 1963: Williams had previously asked Mullan Contracting to become the general contractor. At a meeting on this date, there was some discussion relative to Mullan Contracting's obtaining the construction loan from Maryland National Bank. Tinley again said that Weaver Bros. would advance $200,-000 on a second mortgage basis for working capital.

At another meeting on this same date (or maybe at the same meeting mentioned above), Tinley allegedly said that Weaver Bros. would take a $500,000 second mortgage to assure completion of the building, if necessary.

September 18, 1963: Weaver Bros. made the $480,000 land loan to St. Paul.

October 10, 1963: Mullan said that his application at Maryland National for $4,800,000 had been approved, subject to a $500,000 second mortgage from Weaver Bros. to be used for land fees and costs. Tinley denied that he had made an offer of a second mortgage, and an argument ensued. Williams said he would ac-

cept Manufacturers' offer for a construction loan and asked Tinley to place it. Tinley said Manufacturers' offer for the construction loan had been withdrawn. The trial court found that the offer had never been withdrawn and was still good as of this date, and that Williams' statement to Tinley acted as an acceptance of Manufacturers' offer.

Shortly thereafter a meeting took place at which Tinley suggested that Williams sell his interest in St. Paul to make it easier to get the construction loan; Williams refused.

November 25, 1963: Meeting where Tinley suggested sale to Messrs. Gottschalk and Grant. Williams left in a huff.

November 26, 1963: Tinley said he could still place the construction loan and asked for two more weeks; Williams gave him until December 6, 1963. On the same date, Williams called Lubow of Merchants and resubmitted his original proposal.

December 6, 1963: The original agreement between St. Paul and Weaver Bros. was "finally terminated". They entered into a new contract. As the trial judge put it:

"Tinley described Weaver's obligations under this new Agreement as being, first, to make sure that the Buy-Sell Agreement between the construction and permanent mortgage lenders was signed by all of the parties at the construction mortgage loan settlement; and, second, if any problems arose, to assist in ironing them out. Under this new contract Plaintiff was obligated to pay Weaver $96,000 for its services — $48,000 in cash and $48,000 at a later date. Weaver agreed that it would not assert any claim against the fee of Merchants * * * for placing the construction mortgage loan."

The trial judge found as a fact that Manufacturers' offer to make a construction loan was still open at this time.

December 6, 1963: St. Paul and Merchants entered into a contract under which the latter was to be paid $72,000 for obtaining a construction mortgage loan commitment for the project. A fee of $10,000 was to be paid to certain persons who had introduced Williams to Merchants.

December 27, 1963: Commitment issued by Chemical.

March 9, 1964: Plans and specifications for the project were finally approved by Weaver Bros. on behalf of Manufacturers.

April 8, 1964: Plans and specifications were finally approved by Manufacturers.

April 27, 1964: St. Paul executed a contract with Mullan Contracting, the use plaintiff, for construction of the building.

May 1, 1964: Closing of Chemical's construction mortgage loan was held in New York, at which all of the necessary documents were executed, including a promissory note in the amount of $4,800,000 and the "Buy-Sell" agreement between Manufacturers and Chemical.

August 19, 1965: The expiry date under Manufacturers' permanent mortgage loan commitment was extended from September 7, 1965, to March 7, 1966, by letter from Manufacturers to Weaver Bros. Plaintiff paid Manufacturers $24,000 for such extension.

March 4, 1966: At a meeting of its executive committee Manufacturers decided not to extend the commitment any further. Lamon was instructed to advise Chemical.

March 8, 1966: Manufacturers wrote Weaver Bros. cancelling the commitment.

April 13, 1966: Chemical filed foreclosure action.

June 1, 1966: Foreclosure sale. There was only one bidder at the sale, and the property was knocked down to a representative of Chemical.

February 23, 1967: Decree in personam was entered in the foreclosure proceedings against St. Paul in the amount of $1,297,952.39.

The commitment of Manufacturers provided in pertinent part:

"It is understood that our funds will not be required until we receive a report from your inspector certifying that construction of the building has been satisfactorily completed, and the certificate of an architect, approved by our Company, certifying that construction has been completed in accordance with the plans and specifications which are to be submitted to us for approval. Engineering and architectural approval of the project is also required."

A "Buy-Sell" agreement was entered into between Chemical and Manufacturers. This appears to be the conventional practice in financing of this type. One paragraph of that agreement, which was in the form of a letter from Chemical to Manufacturers, stated:

"1. At any time on or before September 7, 1965 (or the last day to which the commitment may be extended, if any extension thereof has been made as provided herein), if the conditions of the Commitment have been fulfilled, you agree to purchase and we agree to sell the Note for $4,800,000."

Manufacturers accepted the agreement, Weaver assented to it, and St. Paul appended its consent to the agreement and agreed that it would "(i) take or cause to be taken

any action required of the Borrower in order to comply with the terms, covenants and conditions of this Agreement and the Commitment, (ii) accept a loan from [Chemical] under the Commitment and (iii) not accept from any other person or persons a loan secured by a deed of trust creating a first lien so long as the Commitment ha[d] not expired."

The trial judge said in his findings of fact relative to the June 14 meeting to discuss the Manufacturers' commitment:

"Williams' testimony as to this meeting was that Tinley said that satisfactory completion meant the work had to be done in a workman-like manner, and in accordance with the plans and specifications. Williams further testified that the degree of completion was discussed, and that Tinley said that an inspector would check the work monthly. Williams further testified that Whiteford had said that a construction loan had to be part of the package, and Tinley said we could rely on Weaver having a construction mortgage by September 1, 1963; that Whiteford said that the money had to be available by September 1, 1963. * * * The reason for the finding is that it is clear from the testimony of all the parties that at that point, Tinley was enthused about the project and its prospects, had obtained a permanent loan commitment from Manufacturers, and sincerely believed that with the permanent loan commitment on hand, he would have no difficulty in obtaining a construction mortgage loan commitment. Williams further testified that he asked if the word completed meant that everything had to be finished and Tinley replied that the building didn't have to be completed in every detail. I find that was the substance of what Tinley said, primarily because that's the sub-

stance of the testimony Tinley gave here in Court. Tinley stated that Manufacturers' proposal had to be accepted and the standby fee paid by June 24, otherwise the offer was void. Finally, Whiteford asked Tinley if there was any question about the items discussed at the meeting, saying that this was a serious step, and Tinley said no. Again, I am confident that that's the gist of what took place, and so find.

\* \* \*

"In his version of what transpired at this meeting, Tinley said that everyone was delighted with the information that the permanent loan commitment had been obtained, that Williams was interested to know whether there would be an architect coming from Canada, and that he advised Williams, from his own experience, that the answer was no; that, however, inspection by an architect would be necessary, unless an inspector was appointed to make monthly inspections. Tinley said that Williams inquired what the term satisfactory completion meant, and he replied that the building had to be finished, that every apartment had to be ready for occupancy; that Williams further inquired about the term—satisfactory completion—and he said it was not absolutely necessary that the building be 100 per cent completed; that if some completely minor items remained to be done, roll over would take place. Tinley further testified there was a discussion about the last paragraph of the commitment letter, and that he said it meant what it said. He further testified that Williams inquired whether everyone always met the date set forth in the commitment letter, and he said it had been his experience, that if an owner-builder got to the point where an additional thirty days was necessary for completion, he would ask for an extension and

normally get it. Tinley further testified that there was a discussion about whose responsibility it was to get the certificates referred to in the third paragraph of the commitment letter, and that he told Williams that the burden would be upon him. I find that that statement was made. It would be a logical statement for Mr. Tinley to make in response to that inquiry.

"Asked about the engineering and architectural approval referred to in the third paragraph of the commitment letter, Tinley testified that he said it would have to be received before roll over; that whoever gave such approval was to send it to Manufacturers, who had the right of final approval.

"Tinley admitted that, at that meeting, he made an offer of a $200,000 second mortgage for working capital purposes; that this is what Williams wanted. Tinley, on cross examination, testified that he did not remember Whiteford saying St. Paul couldn't make an application for a permanent loan without assurance of a construction loan; that, however, Whiteford impressed on everyone it was very important to get a construction loan to pick up the land and go ahead with the project. Tinley stated that he told those in attendance that he would undertake to get a construction loan on a best efforts basis; that Whiteford gave Weaver authority to go ahead with the permanent loan application, without Weaver's assurance of a construction mortgage. However, as I have already stated, I find that there was assurance of a construction loan commitment."

The two top floors of the building, 22nd and 23rd, were damaged in 1966. On this subject the trial judge said in his finding of fact:

"Next comes the question of the storm and

the alleged resulting damage. The weather reports, in my judgment, are inconclusive. I have examined them. There was a bad blizzard. There was a time after the blizzard, a week or ten days later, where the daytime temperature did rise to a point where there would have been a thaw. The difficulty with proof of this phase of the case as far as Plaintiffs is concerned is that the time when the leak developed is not pinpointed. No witness testified that the leak was discovered on February 13 or 14, the day when quite a bit of thaw took place. Neumayer testified, however, that the terraces had been tested for leaks. That tends to negate the idea of the damage being attributable to the storm. So that I find that Plaintiff has not met — for whatever significance it has in the case — its burden of proving that the damage to the 22nd and 23rd floor suites was due to 'an act of God'."

This damage was a factor in the question of whether the building had been completed at the time of the March 7 deadline.

At one point there was sincere belief on the part of Williams that Mullan would not be able at the pace at which he was going to complete the building by March 7.

On the question of completion of the building the trial judge said:

"Finally, I find as a fact that the high-rise apartment building at the northeast corner of St. Paul and Chase, as of March 7, 1966 was substantially complete. The reasons for that finding are manifold. Mullan says it was substantially complete; Cogswell said it was substantially complete and Cogswell was Manufacturers' and Weaver's representative; Neumayer says it was substantially complete; the photographs taken by Tadder are only of the top two

floors. You can bet your bottom dollar if there was substantial evidence of incompletion of the project on the remaining floors other than the first floor, there would have been photographs of that state of incompleteness. He had been asked by Weaver, according to his own testimony, to take photographs showing what had not been completed.

"Just as significant, in my judgment, is the inspection by Lambert. This was made under circumstances where Lambert knew that Manufacturers was cancelling the commitment letter. He read the handwriting on the wall. He knew that he had been asked to prepare an inspection report which, if called for, would justify (if possible) the position taken by Manufacturers. I have reviewed his report carefully, and it is, to say the least, not objective. In the first place, in making the examination, he shows some lack of familiarity with the plans and specifications. Of 238 apartments in the building, as I compute it, he found 67 okay; there was nothing that he could find wrong, not even a scratch on the walls. In other words, there were at least 67 apartments which tenants could have occupied on March 7. There were three that he said he couldn't inspect. There were approximately 100 apartments in which the items which Lambert said needed correction, were obviously of the most minor nature — which could have been corrected in twenty-four hours — what I consider to be a punch list item. There were fifteen more apartments where his comment was — 'Clean out hatch not plastered.' As Charles Mullan pointed out, the purpose of the clean out hatch would be completely nullified if you plastered over it. Obvious nitpicking.

"When I say minor items, I'm talking about

this sort of thing: 'Room 311, bath, vanity fixture hung below outlet, wire shows,'—only one item in that room. So when I say minor, I mean petty. Where Lambert's report showed more than one item to be corrected in a room or suite, I have not considered that as minor. But even in the rooms which had several items which allegedly required correction, they were items that could have been corrected before a tenant would want to move in. For example, in Room 1102, 'Dining room electric light fixture not properly installed. Bath, ceiling plaster finished splotchy.' I don't consider that minor, but obviously on the face of it, it is something that could be taken care of in one morning at most — probably fifteen minutes for the light fixture and an hour for the plaster job. The only part of the building that was not in this minor or comparatively minor category was some of the exterior work and some of the suites on the 22nd and 23rd floors. Here we're dealing with an apartment house that has 238 apartments, ten of them on the top two floors. Ten out of 238, and even in those, the work was finished, according to the testimony before me, within a week after March 7, 1966.

"So that my finding, so far as the state of completion is concerned, is that the building was substantially completed. Again, the determination of the legal effect of this finding must await tomorrow's edition."

There were suggestions from time to time through the record that Tinley and Weaver Bros. did not want Manufacturers to know that the loan here was intended to cover the entire construction cost. There is some intimation that this was the reason that Tinley did not proceed with the closing of a construction loan with Manufacturers.

## LIABILITY

At the conclusion of trial on the issue of liability and before presentation of evidence of damages the trial judge rendered an oral opinion which we adopt:

### "CONCLUSIONS OF LAW

"We now come to the point in the case where I am required to make certain conclusions on the question of liability. As is true in most cases, these conclusions are in some instances exclusively legal, in others, they are combinations of fact and law.

"There are several preliminary questions which must be considered before I get to the ultimate decisions which must be made.

"I. *Weaver — Agent for St. Paul and Manufacturers.*

"The question of agency has arisen in this case. I have found as a fact that Weaver acted as agent for both St. Paul and Manufacturers. In *Hogan v. Q. T. Corporation,* 230 Md. 69, 75, the Court of Appeals said that 'the existence of a principal-agent relationship is ordinarily a question of fact. * * * And since such relationship may be implied from the words and conduct of the parties and the surrounding circumstances, the question was properly submitted to the jury, and its verdict should not have been set aside.' So that such agency has been determined by me, sitting as a jury, as a matter of fact.

"II. *Weaver's Responsibilities as Agent.*

"Next, is the question of the responsibilities of Weaver as broker-agent. In *Hardy v. Davis,* 223 Md. 229, 232, the Court of Appeals had this to say on the subject of a real estate broker acting as agent for both parties: 'During the term of the agency, a real estate broker can not act

for both vendor and vendee in respect of the same transaction because of possible conflict between his interest and his duty in such case, and he must disclose to his principal all facts or information which may be relevant or material in influencing the judgment or action of the principal in the matter. *Coppage v. Howard,* 127 Md. 512, 523; *Restatement (Second), Agency Sec. 381.'* Of course, Weaver did act as agent for both, and, in my judgment that dual agency was known both by Manufacturers and by St. Paul. St. Paul had hired Weaver as its agent and broker, and yet it knew through the multitude of letters and phone and face to face negotiations that Weaver was also acting as agent for Manufacturers. Many of the communications were directed by Manufacturers to Weaver. As I recall it, none in writing were directed to St. Paul. So that the fact that Weaver was. acting as agent for both parties did not, in and of itself, constitute a breach in violation of the holding in *Hardy v. Davis* (supra). Nevertheless, when one acts in such a dual capacity, one has an even greater responsibility to be sure that he walks a straight line and acts in a fair manner towards both principals, than if he were acting for only one party.

"On the degree of care which an agent must exercise, 12 Am.Jur.2d, 847, Sec. 96, says that—

'As a general rule, a broker who is not a mere middleman, but is employed by a principal to act as his agent in a transaction, is bound to exercise reasonable care and skill, or the care and skill ordinarily possessed and used by other persons employed in a similar undertaking. He must exert himself with reasonable diligence in his principal's behalf, and is bound to obtain for the latter the most

advantageous bargain possible under the circumstances of the particular situation. * * *

'* * * A broker is not liable for a mere mistake in judgment which does not result from a failure to know or do that which a person of ordinary prudence under similar circumstances would know or do. * * *.'

'In the absence of special circumstances giving the principal a right to rely on the agent's skill and care, the principal has been held to be barred from recovering for the agent's negligence by his own contributory negligence.'

"In *Nagel v. Todd,* 185 Md. 512, at page 516-517, the Court of Appeals had this to say on this subject: 'In *DeCrette v. Mohler,* 147 Md. 108, 115, this Court, speaking through Judge Walsh, said: "The principal duty of an agent is loyalty to the interest of his principal. The very nature of the relationship of principal and agent demands that the latter give to the former the fullest measure of service in all matters pertaining to the agency, and that he devote all his skill and ability to securing the greatest legitimate benefit and advantage for his principal. Experience has taught us that no man can serve two masters, and for this reason it has long been an established rule of law that an agent cannot recover from his principal in any transaction in which the agent's interest was antagonistic to that of the principal, unless such interest was fully and fairly disclosed to the principal" citing *Mechem on Agency,* 2nd Ed., Sec. 1588 et seq.'

"The responsibilities and duties of an agent are discussed in some other Maryland cases. In *Maryland Credit Finance Corp. v. Hagerty,* 216 Md. 83, 90, 92, the Court of Appeals, after quot-

ing, as I have just done, from *DeCrette,* said: 'Where the breach of duty by the employee was wilful and material, as we find it to have been in the case before us, the Courts have held consistently that the employee has forfeited at least compensation which has not already been earned. The rule was recognized, although found inapplicable on the facts, in *Shipley v. Meadowbrook Club,* 211 Md. 142, 148. It was there said that: "We accept the general principle that an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a wilful and deliberate breach of his contract, may be denied compensation for his services." ' There are a number of authorities cited at that point.

"In *Buffington v. Wentz,* 228 Md. 33, 38, the Court of Appeals said this: '* * * that the broker was under a duty to make full disclosure to his clients of all of the relevant facts which might influence the judgment or action of his principals.' citing several Maryland cases, and *Restatement, Agency, Second edition,* Secs. 381, 389, 390; also 8 *Am. Jur., (Brokers),* Secs. 89, 91.

"Again on this subject, *Coppage v. Howard,* 127 Md. 512, 523, the Court said: '* * * A broker employed to sell real estate occupies a *quasi fiduciary* relation to his employer, and in his dealings with him is bound to act in good faith and to make disclosures of matters that are material and might affect the action of his employer in the premises. This principal is fully recognized in this State.' citing three earlier Maryland cases.

"Finally on this subject, *Virginia Dare Stores, Inc. v. Schuman,* 175 Md. 287, 291-92, the Court said: 'It appears from the declaration hereto-

fore referred to that this action is founded upon negligence in misrepresentation. No Maryland case has been found directly upon the subject, but the weight of authority in other jurisdictions seems to be that such action is not necessarily confined to injuries arising from contractual relations; that the action lies for negligent words, recovery being permitted where one relies on statements of another, negligently volunteering an erroneous opinion, intending that it be acted upon, and knowing that loss or injury are likely to follow if it is acted upon.' citing a number of authorities.

"Referring to the argument of day before yesterday, Mr. Freishtat contended that Weaver had held itself out as having special skill in the subject of obtaining mortgage financing, such as is involved in this case, and that St. Paul and Williams had relied thereon to their loss. In response, Mr. Case contended that there was a failure of proof of special skill and reliance thereon, and also that there was a lack of expert testimony as to the standard of care required in such a case. In my judgment, this is not a case which requires the production of expert testimony. However, it appears that in this case, and in other cases like it, it's not so much a question of some higher degree of care, but of the degree of care one would expect of the particular person involved, whether he is a doctor, or a lawyer, or a real estate broker or specialist.

"The case which Mr. Case referred to in argument is *L. B. Laboratories, Inc. v. Mitchell*, 235 Pac. (2d) 253, 257, had this to say: 'The courts have uniformly based recovery upon principles of negligence where there is failure to employ the knowledge, skill and judg-

ment which is engaged to be rendered in professional employment, or other employment of a highly specialized nature. A member of the learned professions, and for that matter any one who undertakes employment because of his possession of exceptional skill, impliedly represents that he possesses and will employ the degree of learning and skill usually possessed by those in good standing practicing their specialities in the same locality. He impliedly agrees to use his best judgment but does not guarantee results. *Roberts v. Parker*, 121 Cal. App. 264; 8 Pac. (2d) 908. "In all those employments where peculiar skill is requisite, if one offers his services, he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretentions are unfounded, he commits a species of fraud upon every man who employs him in reliance on his public profession. But no man, whether skilled or unskilled, undertakes that the task he assumes shall be performed successfully, and without fault or error; he undertakes for good faith and integrity, but not for infallibility, and he is liable to his employer for negligence, bad faith, or dishonesty, but not for losses consequent upon mere errors of judgment." (Cooley on Torts, (4th Ed.), Vol. 3, p. 335).'

"III. *Commitment Letter—Time of Essence?*

"Next, one other preliminary question is whether time was of the essence in this contract, the commitment letter of June 7, 1963. It is my judgment, and I so hold, that time was not of the essence of this contract. My reasons for that holding are several. First, the language itself negates the idea of time being of the essence. The last paragraph says: 'The commit-

ment may be canceled,' not, as does the paragraph immediately preceding, that 'This commitment shall become void if by June 24, 1963 we have not received written acceptance of the same, * * *.' Clearly that paragraph was time was of the essence. If the refundable standby fee had not been paid and the offer contained in the letter had not been accepted by that date, that would have been the end of—the complete end of the matter. So that you have that very definite difference in language. Now the only thing in the last paragraph that would make time of the essence is that a date is mentioned. However, when you compare the language of the two paragraphs it becomes obvious that, so far as the last paragraph is concerned, time was not considered of the essence.

"Another reason is that the law is clear that one who draws a contract can expect to have that contract construed against him. '* * * this Court cannot disregard the rule of construction of contracts often restated by it, that where an ambiguity exists, a contract will be most strongly construed against the one who prepared it.' *Kelley Construction Co., Inc. v. Washington Suburban Sanitary Com.,* 247 Md. 241, 250; *Hughes v. Pioneer,* 230 Md. 36, 38; *Ebert v. Millers Fire Ins. Co.,* 220 Md. 602, 611; *Cadem v. Nanna,* 243 Md. 536, 544. This rule is particularly applicable to insurance contracts. Although this is not an insurance contract, it is a contract drawn by an insurance company; and there is a reasonable inference that they were familiar with that rule of law.

"Another reason for my holding on this point is that Manufacturers knew that, if this commitment were accepted and if it were followed by a construction mortgage loan so that the

project would go forward, St. Paul would expend large sums of money in reliance upon commitment, and also knew of the possibility, at least, that exactly what did occur, might occur.

"Finally, the construction placed upon this contract by the actions of the parties. When September 7, 1965, arrived, what did Manufacturers do? Did it say, stop, you have not met the date specified in the last paragraph? No, it not only did not say stop, it gave a six months extension — six months additional life to the agreement. So that it is clear not only that time was not of the essence, but that the parties did not consider it to be.

"There are two Maryland cases which I have found that deal generally with this subject, and which throw some light upon it. The first of these is *Scarlett v. Stein,* 40 Md. 512, 525-526. There, the Court said: 'Parties may, no doubt, make *time* an *essential part of a contract,* and in such cases, the failure by one of the parties to perform his part of the obligation within the time prescribed, discharges the other from all liability under the contract. Whether time is to be considered *as of the essence of the contract,* must, of course, depend upon the intention of the parties. When this intention is expressed in clear and unambiguous terms, the contract must speak for itself, and the liability of the parties must be determined by the plain and obvious meaning of the language used. If, however, this intention is not expressed in clear and direct terms, courts may look to the acts and conduct of the parties, in order to find out the meaning which they themselves have put upon the contract.' And that is why I have emphasized the factual phase of this problem, because from such facts one can ascertain that the in-

tention of the parties was that time was not of the essence. Also bearing on this subject is *Kasten Constr. Co., Inc. v. Maple Ridge Constr. Co., Inc.,* 245 Md. 373, 377. There, the Court said: 'In a case involving specific performance, where the intention of the parties is always the controlling factor, the general rule is that time is not of the essence of the contract of sale and purchase of land unless a contrary purpose is discovered by its terms or is indicated by the circumstances and object of its execution and the conduct of the parties. * * * Ordinarily, however, time is held to be of the essence only when it is clear that the parties have expressly so stipulated or their intention is inferable from the circumstances of the transaction, the conduct of the parties or the purpose for which the sale was made.', citing a long list of Maryland cases.

"Now, as I said once before, we come to the nitty gritty. I have tried to sift from my recollection of the declaration, from all of the facts and from argument of counsel, what I consider to be the questions which I have to consider and decide. They are as follows, without comment, in the first instance:

"First, the contention that Weaver and/or (I hate that expression but it applies here) Manufacturers alleged delay in approving the plans and specifications constituted negligence so far as Weaver and/or Manufacturers is concerned. Subsidiary to that question, even if one or both were negligent, was such negligence the proximate cause of any loss or damage sustained by St. Paul?

"Second, the contention that Weaver was negligent in its failure to procure a commitment for a construction mortgage loan.

"Third, the contention that Weaver's failure to button up Manufacturers' offer of a construction mortgage loan commitment constituted either a breach of contract or negligence on the part of Weaver.

"Fourth, whether by virtue of some act, or failure to act, Weaver has forfeited its right to retain the $48,000 fee paid it for obtaining the permanent mortgage loan commitment.

"Fifth, whether Manufacturers' cancellation of the permanent mortgage loan commitment constituted a breach of contract on its part.

"*First.* A great deal of the testimony before me and many of the exhibits are related to the question of delay, *vel non*, in the approval of the plans and specifications. * * * [E]ven if there were negligence it was not the proximate cause of any damage which has been sustained by St. Paul.

"*Second.* It is contended that Weaver was negligent in its efforts to procure a commitment for a construction mortgage loan. At this point, I'm not going to consider the question of Manufacturers' offer. * * * I cannot find from the evidence that St. Paul has met the burden of showing that Weaver was negligent in its failure to procure a commitment for a construction mortgage loan. And once again, I'm not referring to Manufacturers' offer.

"*Third.* We come to the allegation that Weaver was negligent in its failure to button up Manufacturers' offer of a construction mortgage loan commitment. If we bear in mind the authorities which I cited at the beginning of this opinion concerning the responsibility of an agent, particularly his responsibility to make full disclosure to the principal, what Weaver did in this case becomes of major significance.

This is not a case of mere failure to disclose. Weaver knowingly made a misstatement of fact. On October 10, 1963, Williams told Tinley that he accepted Manufacturers' offer of a construction mortgage loan commitment and that Tinley should close it immediately. Tinley's response was that the offer was no longer open, that it had not been accepted promptly enough. And yet the evidence is clear beyond a doubt that the offer was still open on that date (and remained open, as a matter of fact, down to the very day that the Chemical construction mortgage loan was buttoned up) and that Weaver knew this. This was a clear breach of a duty which Weaver owed St. Paul, and I so hold.

*"Fourth.* Is Weaver liable for return of the $48,000 fee which it was paid for obtaining the permanent mortgage loan commitment? You will recall that in one or two of the authorities to which I referred in the beginning of the opinion, it was stated that for breach of duty an agent could lose a fee otherwise coming to him unless it had been earned. This poses a problem in this case because St. Paul agreed to pay Weaver $48,000 for obtaining a permanent mortgage loan commitment, and another $48,000 for obtaining a construction mortgage loan commitment. Weaver did obtain the former; so that, from that point of view, it had earned $48,000. However, when you look at all the evidence, particularly what transpired at the end, you have here a concern which, under the facts as I have found them, was acting as agent for St. Paul on the one hand and for Manufacturers on the other, and owed a great responsibility to each because of that dual relationship. Yet at the very end, it's all for Manufacturers, nothing for St. Paul. Tinley goes to the build-

ing and inspects it not once but on several occasions without Williams being there. The only reasonable inference that can be drawn from that is that such inspections were to be reported to Lamon.

"Weaver hires a photographer to take pictures. Of what? If Weaver was, in good faith acting as agent for both, photographs would have been taken of what had been completed properly as well as everything that had not been completed. However, according to Defendants' own witness, he was instructed to take photographs of portions of the building which had not been completed.

"Lambert's inspection on March 8th and the 9th starts out at Weaver's office, moves from there to the building.

"The circumstance under which the letters of March 29 and March 30 were obtained from Cogswell and Neumayer—Cogswell, Tinley and two representatives of Manufacturers, were at Weaver's—not Williams or any representative of Williams. The following day the same thing happened. A letter was obtained from Neumayer. Williams was not present. Two representatives of Manufacturers were — also Tinley. You have the Gottschalk and Grant incident, where Tinley was hopeful of peddling the whole deal to them, being fearful that Williams could not go through with it. So that you have a series of acts which show that, while they were transpiring, Weaver did not act as it should have towards one of its two principals. If Weaver had spoken up, as agent for Williams and St. Paul, and said to Lamon, here, this building is for all practical purposes complete, in a week or ten days or two weeks we can have tenants moving in and the income

stream will start to flow—who knows but that Lamon and Manufacturers might have taken a different view of canceling the contract. However, Manufacturers did cancel the contract. So that the service which Weaver had rendered, and which under other circumstances would have earned it its fee, was lost, lost completely so far as St. Paul was concerned. It is my judgment that the conduct of Weaver, which I have just described in some detail, requires a finding against it on that count of the declaration which seeks the return of the $48,000 fee, and I so hold.

"*Fifth.* Finally we come to Manufacturers canceling the permanent mortgage loan commitment. Mr. Case said yesterday, and I agree with him, that the words, 'It is understood' are synonymous with 'It is agreed'. I read the case to which he referred, the *Phoenix Iron and Steel Co. v. Wilkoff Co.*, 253 F. 165, 167-172. It is highly persuasive. It is my judgment that 'It is understood' is just the same as 'It is agreed', and that is the agreement which is set forth in the third paragraph of Plaintiff's Exhibit No. 4. Now what is that agreement? The meat of it is, 'It is understood that our funds will not be required until we receive a report from your inspector certifying that construction of the building has been satisfactorily completed', and then goes on to the part concerning the certificates required. What does satisfactory mean? I have just purchased what the New York Times Book Review Section says is the best dictionary ever published, edited by The American Heritage. The second definition there of the word satisfactory is adequate. Webster's New International, Second Edition, defines satisfactory as follows: (None of the first definition

applies here) 'giving or producing satisfaction; yielding content; as: adequate for the purposè; offering adequate treatment oŕ fullness of detail; of a kind to meet all requirements or expectations; explaining fully; serving to allay the demands of a questioner or challenger; relieving the mind from doubt or uncertainty; as a *satisfactory* pension, report, marriage, provision, excuse.' The synonym is stated as adequate, satisfying, expiatory. The antonym is unsatisfactory or inadequate. So that satisfactory does not mean perfect. It does not mean absolute. It does not mean to the last nut and bolt. And that is borne out by the construction placed upon the word by Lamon. He was perfectly candid in his testimony before me. He said that roll over would not have been stopped by `the fact that the commercial space on the first floor was not complete; that roll over would not have been stopped by the fact that a punch list had to be completed; that roll over would not have been stopped by a combination of those two factors. It's obvious to me from his testimony that he did not interpret satisfactory as complete one hundred percent, down to the last nut and bolt. It necessarily follows, that, if it's not absolute, final, complete without anything of any kind no matter how minute remaining to be done, it is a question of degree. And degree brings us inevitably to the question of substantial compliance.

"Substantial [Performance], in 17 Am. Jur. (2d) (Contracts), page 818, section 375, is described as follows: 'Although there is some early authority in support of the rule that a party must strictly or literally perform the stipulations on his part before the other party is obligated to perform, unless the promises are

independent, the modern authorities support a more liberal rule. Thus, it is said that the law looks to the spirit of a contract and not the letter of it, and that the question therefore is not whether a party has literally complied with it, but whether he has substantially done so. This has long been the rule in equity. Accordingly, the courts now state that substantial, and not exact, performance accompanied by good faith is all the law requires in the case of any contract to entitle a party to recover on it.' And then skipping to the next page, 'While the doctrine of substantial performance is applied most frequently in building and construction contracts, it is not so limited and may be applied in the case of any kind of contractual obligation to perform.' Now in the first quotation it is stated that 'performance accompanied by good faith is all the law requires', and I don't think that anyone can say that St. Paul and Williams did not operate in good faith. They did everything possible to push for the completion of this project by the 7th of March, 1966.

"There is also a note in 76 A.L.R. (2d) 815 et seq., which admittedly is related only to construction contracts, but where cases are cited from almost every state in the Union. All the leading authorities follow this rule of substantial compliance—Illinois, Massachusetts, Michigan, New Jersey, New York, Pennsylvania.

"In Maryland, it has been applied. At the time of the decision on the Motion for Summary Judgment, I referred to the case of *First National Realty Corp. v. Warren-Ehret Co., Inc.,* 247 Md. 652, 656. There are several portions of that opinion to which I wish to refer. It's just as good law today as it was when we had the Motion for Summary Judgment. In that

case there was a requirement that the work be approved by the architect, like we have here. The Court had this to say: 'If we were concerned with only the question of substantial performance, this case could be put to rest with the decisions of this Court * * *' citing several cases including *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, opinion by Judge Hammond, which is to the same effect. Then it goes on to say, 'However, this case presents the further question of the effect to be given the express wording of the contract set forth in paragraph numbered "Twenty-fifth" which specifically provides that the "opinion" of the contractor will control in deciding whether the subcontractor (Warren-Ehret) prosecuted the work with promptness and diligence or failed in the performance of any of the agreements contained in the contract.

" 'There are a number of Maryland cases which have dealt with the question of the performance of a contract to the satisfaction of one of the parties, * * *'. That, in substance, is what we have here. The Court then proceeded to cite a number of authorities in and out of the State, including textbooks, and went on to say, in quoting from 13 Am. Jur. (2d) (Building & Construction Contracts), section 30, page 32, where the architect or the owner or somebody has the final say, 'Nevertheless, even under the latter view, the owner's claim of dissatisfaction must be made in good faith, and this is ordinarily a question of fact for the jury.' The Court went on to say (page 660), '* * * whether the objective criteria (i.e. reasonable-man rule) or subjective criteria (i.e. the individual personal satisfaction of the owner) must be met, the Courts, with very few

exceptions, have asked the question whether the action on the part of the owner was capricious or arbitrary, and if such action was present it vitiated the quality of the reasonableness of the owner's action in the objective criteria cases and his good faith in the subjective criteria cases.'

"Referring (page 661) to a Pennsylvania decision, *Hood v. Meininger,* 377 Pa. 342, 347, the Court said, '* * * where the Court in rejecting the "reasonable man" test and adopting the subjective criteria test, found in favor of the owner and against the contractor stating: "* * * (1) that the dissatisfaction must be genuine and not prompted by caprice or bad faith, and (2) that if the work is not sufficiently completed for a reasonable determination whether it was or would be satisfactory, then the rejection is premature." '

"Interestingly enough, what brought the problem in *First National v. Warren-Ehret* to a head was a torrential downpour of four to five inches which innundated parts of the building and, as the trial judge said, snapped the patience of the contractor and triggered the dismissal of the roofer, and triggered the termination of the contract. I have no doubt that, in the present case, if there had not been the damage to the 22nd and 23rd floors from leakage, Manufacturers would not have had the gall or the nerve to cancel the contract as it did.

"Now looking at contracts in general, the law applicable to contracts and what happened in this case, was Manufacturers justified in canceling its commitment? It had agreed with Chemical Bank and New York Trust Company that 'At any time on or before September 7, 1965 (or the last day to which the commitment

may be extended, if any extension thereof has been made as provided herein), if the conditions of the Commitment have been fulfilled, you agree to purchase and we agree to sell the Note for $4,800,000.' St. Paul was the beneficiary of that contract. Now, what are the facts and circumstances surrounding the cancellation? In the first place, I am persuaded from all of the evidence that the only stated reason for the cancellation, before the fact, was that the building was not complete. I am persuaded, as Lamon described Williams' reference to the cause of the leaks, viz., a snowstorm, — that it was an afterthought to say that the certificates had not been furnished. Although it is not necessary to hold this, there is some law that if one states a reason for cancellation of a contract, they're stuck with it. They can't later on try to drag in some other reason or excuse. That's the case that Mr. Freishtat referred to in his argument yesterday, *Brush-Swan Electric Light Co. of New England v. Brush Electric Co.*, 41 Fed. 163, at pages 168-169. In determining the answer to this question, it is necessary that the Court bear in mind that basically, the law frowns on forfeitures of any kind. That's what the effect of this cancellation was —all that had been expended on that building at the date of cancellation was lost, so far as St. Paul was concerned. The evidence discloses, based upon my findings of fact, that although Weaver had not told Manufacturers about Williams poor credit experience in Virginia, had not told Manufacturers that Williams had no money of his own to invest in this project, had merely told Manufacturers that the project had to be one hundred percent financed, I have found that Weaver was Manufacturers' agent, and as such all that information was chargeable to

Manufacturers. We then have the February 28, 1966, visit to Baltimore by Lamon, when he learned that Williams might be on thin ice, that he was unhappy with his contractor, that he was considering suit against the contractor, that he was threatening not to pay interest if there were a roll over, until he ironed out his problems with Mullan. These were all matters which I can understand worried Lamon tremendously, but matters which he had no legal right to consider, none at all. He had no right to speculate, even though it was a reasonably good speculation, as to what would happen in the event there was a roll over. Many things might have happened which could have bailed out Williams after a roll over, which would have enabled him to preserve the status quo. But, in any event, whether they would or would not have happened, Lamon had no legal right to anticipate that they would. He had an obligation to live up to his contract, if the other party had lived up to its. I am persuaded beyond any doubt that the reason for the cancellation of this contract was, first, a calculated risk taken by Manufacturers that if it didn't accept the roll over, and if the construction mortgage were foreclosed, and if Manufacturers were sued, that it could weather the storm, either by avoiding liability completely, or if subjected to liability, by minimizing damages. They took that calculated risk, and they're stuck with the result. It is my judgment, and I so hold, that first, this building was substantially completed, and that was all that was required so far as the contract was concerned; second, that Manufacturers had more than adequate protection by an escrow of funds sufficient to complete the building, at which point the necessary certificates would have been forthcoming. So that, so far as the

roll over was concerned, Manufacturers had every legal and practical protection it needed, or could have arranged for such legal and practical protection and was obligated to accept the roll over; that in not accepting the roll over, it breached its obligations under the loan commitment and under the Buy-Sell Agreement of which St. Paul was the beneficiary.

"Now, thus endeth this lesson. We now have to recess for as much time as counsel want to prepare for trial of the question of damages."

## PREJUDGMENT INTEREST

The trial judge allowed prejudgment interest on the deficiency decree from the date of entry of that decree down to the date of his judgment. After quoting extensively from the opinion of Judge Sobeloff (a former Chief Judge of this Court) in *Robert C. Herd and Company, Inc. v. Krawill Machinery Corp.*, 256 F. 2d 946 (4th Cir. 1958), he said:

"It is my judgment that the exercise of judicial discretion requires the award of interest on the amount of the deficiency decree from the date of the entry of that decree down to the date of this judgment. I have considered whether or not interest should be awarded on any other phases of this case, and have determined that to allow interest on the other judgments nisi would constitute an abuse of judicial discretion."

St. Paul and Williams take issue with this, quoting further from *Herd,* asking the Court to take judicial cognizance of the fact that "delay is the best defense", stating that St. Paul "was left impoverished and destitute and faced with huge obligations, on all of which interest was and is accruing, while the Defendants were using the monies wrongfully withheld from St. Paul to their advantage, during a period of spiraling interest rates", and

suggesting that the trial judge abused his discretionary powers.

In *Atlantic States v. Drummond & Co.*, 251 Md. 77, 246 A. 2d 251 (1968), Judge McWilliams said for the Court:

> "Ordinarily the matter of interest is left to the discretion of the jury or the court sitting without a jury. In *Affiliated Distillers Brands Corp. v. R. W. L. Wine & Liquor Co.*, 213 Md. 509, 516, 132 A. 2d 582 (1957), we said:
>
>> "However, this general rule is subject to certain exceptions that are as well established as the rule itself. Among the exceptions are cases on bonds, or on contracts, to pay money on a day certain, and cases where the money has been used. If the contractual obligation be unilateral and is to pay a liquidated sum of money at a certain time, interest is almost universally allowed from the time when its payment was due. [citing cases.]'
>
> To the same effect *see Mullan Contracting Co. v. International Business Machs. Corp.*, 220 Md. 248, 151 A. 2d 906 (1959)." *Id.* at 85.

In *City Pass. Ry. v. Sewell*, 37 Md. 443 (1873), our predecessors said:

> "It must be conceded that interest is not an inseparable and invariable incident of claims for money, or unliquidated accounts. 'It is recoverable as of right, upon contracts in writing to pay money upon a day certain; as upon bills of exchange and promissory notes, or on contracts for the payment of interest, or where the money claimed has been actually used, and upon bonds, etc., but in other cases, *it is a question entirely for the jury to be decided according to the equities of the transaction.' Newson v. Douglass*, 7 H. & J. 417; *Karthaus v. Owings,*

2 G. & J. 430." *Id.* at 452 (emphasis in original).

*See also A. & A. Masonry v. Polinger,* 259 Md. 199, 203-204, 269 A. 2d 566 (1970), which quoted both of the above cases. As *Brantly on Contracts* (2d ed. rev. 1922) puts it:

> "*Interest* is recoverable as of right upon all contracts to pay money upon a day certain, as upon bills of exchange, or where goods sold and delivered are to be paid for at a given time. In other cases the allowance of interest is within the discretion of the jury." *Id.* at 460.

A contract to loan money can not be equated with a contract to pay money on a day certain. The trial judge was the trier of fact. His statement relative to judicial discretion was entirely in accord with the Maryland authorities.

## PUNITIVE DAMAGES

The trial judge allowed punitive damages on both the first and second counts of the declaration. As previously indicated, the first count was a pure contract claim, while the second count alleged negligence by Weaver Bros. in the performance of its contract with St. Paul.[1] Judge Proctor in his award recognized the general rule that in a contract action punitive or exemplary damages are not recoverable, citing 22 Am.Jur.2d *Damages* § 245 (1965) and 5 *Corbin on Contracts* § 1077 (1964). A comment to the same effect is to be found in *Restatement of Contracts* § 342 (1932). The award on the first count was made on the strength of *Brown v. Coates,* 102 App. D. C. 300, 253 F. 2d 36, 67 A.L.R.2d 943 (1958). No Maryland authority was cited to support the allowance of punitive damages in this type of case.

The Maryland rule relative to punitive damages was most recently summarized for the Court by Chief Judge

---

1. Punitive damages were claimed on all of the tort counts of the declaration, but on none of the contract counts including the first count.

Hammond in *Damazo v. Wahby,* 259 Md. 627, 270 A. 2d 814 (1970), where he said:

> "The Maryland rule is that malice in the sense of deliberate and improper violation of a known right, that is, absence of legal justification, will support an action and permit recovery of compensatory damages for deprivation of known contractual rights but that actual malice must be shown to support punitive damages. *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556; *Stannard v. McCool,* 198 Md. 609; *Heinze v. Murphy,* 180 Md. 423. There is no evidence here to show more than that Damazo wanted to benefit himself by receiving the gross purchase price without diminution for commissions and the various purchasers wanted to pay a lesser purchase price that the avoidance of the earned commissions would permit." *Id.* at 638-39.

In *Damazo* a broker claimed commissions on the sale of apartment properties and damages for tortious interference with and conspiracy by the sellers and buyers to deprive him of contract rights. The trial court found the broker was the procuring cause of the sale, that the two parties tried to bypass the broker, and awarded the commissions earned, nominal compensatory damages, and punitive damages. This Court affirmed on liability but reversed relative to punitive damages.

The classic case in Maryland on punitive damages involving tortious interference with a contract is *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908). There a dairy company had a contract with an ice company by which the ice company was to supply the dairy company with ice during a certain season at a designated price. The ice company procured large quantities of ice from Knickerbocker, a company manufacturing ice. Knickerbocker, knowing of the existence of the contract between the dairy company and the other ice company and intending to obtain a benefit for itself, noti-

fied the other ice company that if it sold ice to the dairy company Knickerbocker would refuse to supply any ice to it. Consequently, the ice company broke its contract with the dairy company and that company was compelled to purchase ice from Knickerbocker at a price higher than that stipulated for in its contract with its original supplier.. Punitive damages were claimed. Chief Judge Boyd said for our predecessors:

> "But the difficulty is that there is no evidence of malice in this case, unless it be such as some of the cases speak of—that the intention to benefit the defendant, or to injure the plaintiff, is to be treated as evidence of malice. But we have found no case in which exemplary damages were allowed for malice implied from such facts. The facts stated in the first prayer are in our judgment sufficient to entitle the plaintiff to recover, but we do not think they authorize recovery of exemplary damages, and there was not sufficient evidence outside of those facts to authorize the submission of this prayer. We do not mean to say there may not be such damages in cases of this character, for if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it."
> *Id.* at 569-70.

*Cf. Rinaldi v. Tana,* 252 Md. 544, 250 A. 2d 533 (1969), as commented upon in *Damazo,* 259 Md. at 639.

It is true, as St. Paul urges, that there has been discussion in the Maryland cases of wanton conduct as per-

mitting the recovery of punitive damages. These cases include *Moore v. Schultz,* 31 Md. 418 (1869) ; *Sloan v. Edwards,* 61 Md. 89 (1883) ; *Philadelphia, W. & B. R.R. v. Hoeflich,* 62 Md. 300 (1884) ; *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 20 A. 2d 485 (1941) ; *Heinze v. Murphy,* 180 Md. 423, 24 A. 2d 917 (1942) ; *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 56 A. 2d 813 (1948) ; and *Vancherie v. Siperly,* 243 Md. 366, 221 A. 2d 356 (1966). Comfort is derived from such comments as that of Judge Delaplaine for the Court in *Baltimore Transit Co. v. Faulkner,* where at page 602 "wanton" was defined as : "Characterized by extreme recklessness and utter disregard for the rights of others." None of these cases arose from contract actions. We interpret the language of those cases which speak of wanton conduct or wantonness as being a basis for awarding punitive damages as referring to such conduct as would carry an implication of malice or as conduct from which one would draw a necessary inference of malice, conduct from which one might determine the existence of actual malice. There is no evidence of malice in this case. The sum total of the conduct of Weaver Bros. in this case is but little different from the conduct in *Knickerbocker* where Chief Judge Boyd said, "[W]hen the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it." Accordingly, upon the basis of the prior Maryland holdings, we conclude that the conduct of Weaver Bros. was not such as to warrant punitive damages.

## DAMAGES—MANUFACTURERS—LOSS OF BUILDING

St. Paul upon the strength of its conception of *Hadley v. Baxendale,* 9 Exch. 341, 5 Eng. Rul. Cas. 502 (1854), contends most strongly that it is entitled to recover $7,-920,000 for its loss of the property and $2,465,000 for its loss of the business, the latter figure being the difference

between its valuation of $7,265,000 for the business and the mortgage of $4,800,000. It says that at the time of the contracting Manufacturers had valued the building and land at $7,920,000 and valued the use of the building on an income basis of $7,265,000. It is correct in those statements.

The *Hadley v. Baxendale* rule is succinctly summarized in *Brantly on Contracts* (2d ed rev. 1922) in the following language:

> "The damages which a plaintiff is entitled to recover for a breach of contract 'should be such as may fairly and reasonably be considered as either arising naturally, *i.e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of a breach of it.'" *Id.* at 457.

> \* \* \*

> "When a contract has been made under special circumstances and these were communicated to the defendant then, in case of a breach, the plaintiff is entitled to recover as damages the amount of the injury which would ordinarily follow from a breach. But whether such special damages may reasonably be supposed to have been in the contemplation of both parties depends upon how much of the real situation was so disclosed.

> "The special circumstances which may render a breach more than ordinarily injurious to the one party must be known by the other party whom it is sought to charge with the loss, at the time the contract was made and not afterwards." *Id.* at 459.

This was a contract to lend money. *Restatement of Contracts* § 343 (1932) states upon this subject:

"Damages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the agreed period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made."

5 *Corbin on Contracts* § 1078 (1964) states the rule:

"The better rule and the one generally followed is that for breach of a contract to lend money the borrower can get judgment for damages measured by his resulting injury so far as the defendant had reason to foresee such injury when the contract was made. This is the rule applicable to contracts in general, and a lender of money should be subject to it like other contractors. Doubtless, there are many cases in which he has no reason to foresee that the borrower will be unable to secure money elsewhere or that there will be special injuries; but if he has such reason he must make good the loss. There are many well considered cases that have applied this rule." *Id.* at 447-448.

11 *Williston on Contracts* § 1411 (3d ed. Jaeger 1968) states:

"It will frequently happen that the borrower is unable to get money elsewhere, and, if the defendant had notice of the purpose for which the money was desired, he will be liable for damages caused by the plaintiff's inability to carry out his purpose, if the performance of the promise would have enabled him to do so." *Id.* at 614.

In *F. B. Collins Inv. Co. v. Sallas*, 260 S. W. 261 (Tex. Civ. App. 1924), the loss to which a landowner was entitled in a situation such as this was summarized:

"It is the landowner's interest in the land, rep-

resented by the value of his equity, that he would be entitled to as compensation. For legally the value of the equity is his only 'actual loss.' The value of the equity is not measured, as a matter of law, by the amount of the purchase price paid in cash for the land in the first instance. The value of this equity must appear and be established at the time the title is lost. For the value of the equity at the time the title is lost may or may not be the same as at the time of the original purchase by the landowner. The market value of land rises and decreases, according to conditions and circumstances. If the market value of land goes below the original purchase price paid, the value of the equity would consequently be less and, on the other hand, the value of the equity would be greater if the market value of the land should be greater than the original purchase price paid. In either event the landowner could recover the value of his equity, and no more." *Id.* at 265.

*See also Avalon Const. Corporation v. Kirch Holding Co.,* 256 N. Y. 137, 175 N. E. 651 (1931).

It does not appear from this record that St. Paul was able to go into the marketplace and obtain a loan elsewhere in the time available to it. The foreclosure sale by Chemical took place on June 1. Fruitless efforts were made by St. Paul to obtain funds elsewhere. As Judge Proctor put it:

"[T]he next to the last paragraph [of the permanent mortgage loan commitment] clearly contemplated an antecedent construction mortgage loan and the extension of a Buy-Sell Agreement. This is standard procedure in a transaction such as this. In the first instance the funds are obtained from the construction mortgage lender. The permanent mortgage lender agrees to buy the promissory note, secured by the as-

signment of a Deed of Trust, from the construction mortgage lender upon the completion of the project. It is contemplated that the borrower will use the funds to build the proposed project —to pay direct and indirect construction costs. In such a transaction the parties, of course, anticipate that everything will proceed according to hoyle—that there will be no breach by either party. On the other hand, the would be permanent mortgage lender must contemplate that if, at the last minute, it cancels its commitment such action would be disastrous to the borrower; that in such event obtaining a new permanent mortgage loan would be well-nigh impossible, for the reason that whatever brought about the cancellation would in all likelihood prevent another lender from entering the fray; that one doesn't find someone willing and able to lend $4,800,000 at a moment's notice; that, under such circumstances, foreclosure under the construction mortgage would not only be a probability, it would be almost inevitable."

Accordingly, St. Paul under the circumstances here was entitled to more than nominal damages.

The trial judge here determined that at the time of the loss St. Paul had no equity in the property. In other words he determined the value of the complete building to be not greater than the mortgage. There was ample evidence to sustain this conclusion upon his part. Under Maryland Rule 886, this finding would not be disturbed by us if this were one of the issues specifically argued on appeal. The position of St. Paul is that because a tentative value of the building was assigned by Manufacturers in making its loan that this becomes the criteria for determining damages.

St. Paul misunderstands the application of the rule. It would have been the loss of the building which the parties would have foreseen at the time of entering in-

to the contract. It does not follow that the value of the building and, therefore, the amount of the loss is established by the parties at that time. Judge Proctor was entirely correct in determining that the loss was the equity, if any, in the building. There was no equity. Therefore, he was correct in allowing nothing for loss of the building.

St. Paul would also place a valuation on the business and claim the loss of that. On the issue of lost profits, which was but another way of claiming the loss of the value of the business, the trial judge said:

> "(1) *Alleged Loss of Profits.*
> "In *Lawson v. Price,* 45 Md. 123, 139, appellee brought an action against appellant for obstructing the mill race leading to his distillery. It was held that lost profits could be recovered as an element of damage because they could be ascertained with reasonable certainty. In doing so the Court cited, with approval, Sedgewick on Damages, 89, as follows:
>> 'It may now be assumed to be the general rule that in actions of tort, where the amount of profits of which the injured party is deprived, as a legitimate result of the trespass, can be shown with reasonable certainty, such profits constitute *to that extent* a safe measure of damages. In these cases, the rule adopted with reference to certain breaches of contract which makes the offending party liable for the loss of profits, so far only as he foresaw, or should have foreseen that particular consequence of his act, does not apply. He who commits a trespass must be held to contemplate all the damages which may legitimately follow from his illegal act, whether he might have foreseen it or not; and so far as it is plainly traceable, he should make compensation for it. To this extent, the recovery of a

sum equal to the profits lost, while fairly within the principle of compensation, is also within the limits which exclude remote consequences, from the scale in which the wrong is weighed.'

"In *Winslow Elevator Co. v. Hoffman,* 107 Md. 621, 640-1, the owner of a building (recently constructed) had brought suit against the elevator contractor for, among other things, loss of rents from the building allegedly attributable to the defective elevator. The Court held as follows:

'* * * In *Wolcott v. Mount,* 36 N.J.L. 269, the Court said: "It must not be supposed that, under the principle of *Hadley v. Baxendale,* mere speculative profits, such as might be conjectured to have been the probable results of an adventure which was defeated by the breach of the contract sued on, the gains from which are entirely conjectural, with respect to which no means exist of ascertaining, even approximately, the probable results, can, under any circumstances, be brought within the range of damages recoverable. The cardinal principle in relation to the damages to be compensated for on the breach of a contract, that the plaintiff must establish the quantum of his loss by evidence from which the jury will be able to estimate the extent of his injury, will exclude all such elements of injury as incapable of being ascertained by the usual rules of evidence to a reasonable certainty."

'When the claim of the plaintiffs for the recovery of lost rent is considered in the light of these rules it certainly must be denied. What rent they might have received from the building was not only dependent upon collateral engagements with persons who might rent the rooms, but upon many other consid-

erations, such as location, desirability of rooms, the amount of rent asked, light and air, competition of other buildings, the number of tenants, the ability of the owners to keep the rooms occupied, and the general character of the management of the building, There are so many elements of uncertainty which enter into and affect the question that any estimate of loss could be little short of a guess. The special damages sued for in this case are so uncertain and incapable of reasonable ascertainment that they cannot be recovered.'

"In *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 618, the operator of a new drive-in movie theatre, in a suit by a contractor, counterclaimed for alleged loss of profits attributable to the delay in the work. The Court of Appeals held that because the venture was new profits were too uncertain to form a basis for recovery, saying:

'\* \* \* on the other hand, loss of profits from a business which has not gone into operation may not be recovered because they are merely speculative and incapable of being ascertained with the requisite degree of certainty. *Restatement, Contracts,* Sec. 331, states the law to be that damages are recoverable for profits prevented by breach of contract "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty" \* \* \*.'

See also: *M & R. Builders v. Michael,* 215 Md. 340, 352, where the Court of Appeals cited a number of cases in which plaintiffs were not allowed to recover *'collateral, estimated* and *probable* profits claimed to have been lost.'; *Ab-*

*bott v. Gatch,* 13 Md. 314, 332-4; *Lanahan v. Heaver,* 79 Md. 413, 418-23.

"Reference to the hypothetical question put to the witness Hoffman by Plaintiff's attorney (objection to which, incidentally, should have been sustained by the Court) is sufficient to demonstrate that the alleged loss of profits from this venture were completely speculative. Realization of profits from a new untried venture such as this depends on so many uncertainties that they cannot form a proper element of damages in a contract action, and I so hold."

We adopt that opinion.

## COMPUTATION OF DAMAGES

In computing damages we start with the comment of this Court in *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A. 2d 653 (1943), involving application of the *Hadley v. Baxendale* rule. There a liability insurance policy was issued covering operations of a tractor and trailer within a radius of 500 miles of Salisbury. An accident occurred in South Carolina which the company held not to be within a radius of 500 miles of Salisbury. Judgment was obtained against the insured and his tractor and trailer were levied upon and sold by the sheriff at auction in South Carolina. The insured brought suit in Maryland for the loss of his tractor and trailer. He established the point of accident to have been within a radius of 500 miles of Salisbury. In sustaining the action of the trial court and jury in awarding a verdict to the insured for the loss of his vehicles, Judge Delaplaine said for the Court:

"The court should endeavor to place the injured person, as far as possible by monetary award, in the position in which he would have been, if the contract had been properly performed. *Chamberlain v. Baltimore & Ohio R. Co.,* 66 Md. 518, 529, [8] A. 267; *United States v. Behan,*

110 U. S. 338, 4 S. Ct. 81, 28 L. Ed. 168." *Id.* at 301-02.

### (i) First Count

The trial judge allowed $5.00 compensatory damages and $50,000 punitive damages. We have already indicated that he erred in allowing the punitive damages. Under Rule 886 "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Accordingly, the $5.00 compensatory damages on that count must stand.

### (ii) Second Count

The trial judge allowed $100,000 punitive damages and $185,167.40 in compensatory damages, the latter figure being made up of the $175,167.40 which St. Paul was entitled to draw from Chemical but which had not been paid to St. Paul and a total of $10,000 paid to Monen and another in connection with a loan from Merchants.

There is a strong contention on the part of Weaver Bros. that the item of $175,167.40 should not stand. It said:

> "[I]t represents *no true loss* on the part of St. Paul. The Court's award completely overlooks the fact that the funds in question were part of a *loan* from Chemical, that would ultimately have to be repaid. The final advance would satisfy a debt owing [Mullan] Contracting, and create a debt larger *pro tanto* with the construction lender. The 'damage' being fully offset by a 'credit' in another column of the hypothetical ledger, St. Paul has lost nothing. The Court's award is founded on an illusion and clearly should not stand." (emphasis theirs)

The "building loan" agreement between St. Paul and Chemical provided:

> "16. *Trust Fund.* Borrower covenants that

Borrower will receive the advances to be made hereunder and to be secured by the Mortgage, and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the Improvement before using any part of the total of the same for any other purpose, except for payments specifically authorized in Schedule B."

The statement by Weaver Bros. relative to bookkeeping is correct, as far as it goes. One must look to the end of the line, however. Under the contract with Chemical the $175,167.40 item would have been payable to Mullan Contracting. As this case stands, Mullan Contracting as a use plaintiff is to be paid substantially in excess of that amount from any judgments recovered in this proceeding. Therefore, the indebtedness of St. Paul at the conclusion of this litigation will be $175,167.40 greater if this amount is not allowed as an item of damage against Weaver Bros. than if it is so allowed.

The trial judge's basis for charging this item to Weaver Bros. was summed up in his comment:

"From my findings set forth immediately above, it is my conclusion that had Manufacturers been the construction mortgage lender as well as the permanent mortgage lender, the building would have been 'completed', and that such completion would have been certified by Cogswell and Neumayer, and that, therefore, there would have been no retainer. In any event, I find that Weaver's tortious conduct deprived Plaintiff of an opportunity to complete the building to the satisfaction of Manufacturers, who would otherwise have been the construction lender, and to draw down the full amount of the construction mortgage loan."

The trial judge correctly concluded that the items to-

taling $10,000 paid by St. Paul as finders' fees to procure the Merchants loan was a proper item of damage allowable against Weaver Bros.

Since there was error in allowing punitive damages, the damages allowable under this count are $185,167.40 compensatory damages.

### (iii) Third Count

Under this count the trial judge allowed as consequential damages $1,552,783.20, which is the amount of the deficiency decree obtained by Chemical in the amount of $1,297,952 plus accrued interest. On that subject he said:

> "B. *Alleged Consequential Damages.*
>
> "(a) *Chemical's deficiency decree.* The deficiency decree held by Chemical is part and parcel of the foreclosure proceedings which would not have been instituted had Manufacturers fulfilled its obligation under its letter of commitment and under the Buy-Sell Agreement — Plaintiff would not be saddled with this debt which, since February 23, 1967, has been bearing interest at 6% per annum. As was said in *Pennsylvania, etc., Casualty Insurance Co. v. Messenger (supra),* 'The Court should endeavor to place the injured person, so far as possible, by monetary award, in the position he would have been if the contract had been properly performed.' See also: *Wartenbe v. Car-Anth. Mfg. Co.,* 362 S. W. (2) (Mo.) 54, 56. To do that in this case it is necessary that I require Manufacturers to pay to Plaintiff such a sum as will enable it to liquidate its obligation under the deficiency decree."

We adopt that opinion.

On the remaining items the trial judge said:

> "(b) *Finder's Fee paid Manufacturers for extension,* Manufacturers was paid a finder's fee of $24,000 for extending the expiry date

from September 7, 1965, to March 7, 1966. There is no causal relationship of any kind between Manufacturers' breach and the payment of this fee. It was not in any way a consequence of that breach, and for that reason this claim is disallowed.

"(c) *Weaver's Finder's Fee of $9,600.* In order that Plaintiff might fulfill its obligations to the landowners under the land options, so that the land would not be lost, Weaver agreed to lend and Plaintiff agreed to borrow the sum of $480,000. This transaction took place on September 18, 1963. For placing the mortgage Weaver charged a finder's fee of $9,600. There is no causal relationship whatsoever between Manufacturers' breach and his expense, and it is, therefore, disallowed as an element of damage under this contract.

"(d) *Interest on the $480,000 mortgage.* When the Chemical construction mortgage loan was closed in New York on May 1, 1964, the mortgage in the amount of $480,000 was paid off, as was accrued interest in the amount of $18,160. This is disallowed as an element of damage, for the reasons just stated.

"(e) *Merchants' Finder's Fee.* As I have already stated, the $72,000 fee paid Merchants for the construction mortgage loan was exactly what Plaintiff would have had to pay Weaver and Manufacturers had the latter's offer been accepted. There is no evidence to support a claim for $2,500 attorneys' fee. The $10,000 paid Monen and another has already been allowed as an element of damage in the claim against Weaver. None of these expenses bear any causal relationship whatsoever to Manufacturers' breach, and for that reason these claims are disallowed.

"(f) *Dr. Merrill's $50,000.* When the land for the building site was purchased, Plaintiff agreed

to pay Dr. Merrill the sum of $50,000 as 'moving costs' over and above the purchase price of his land. Once again, there is no causal relationship whatsoever between this claim and Manufacturers' breach, and, therefore, this claim is disallowed."

Except as to Dr. Merrill, we disagree.

The attorney's fee mentioned actually was $3,500. This was an oral opinion and the record is complex. Therefore, it is not surprising that there might be an error of $1,000 in the quotation of figures. The attorney's fee is fully set forth on the settlement sheet filed as an exhibit in this proceeding.

We note that Weaver Bros. said in submitting the original proposal to Manufacturers:

### "CONSTRUCTION COSTS

"The attached Marshall and Stevens appraisal gives us a reproduction cost new of the subject building of $7,245,000. This appraisal service has proven extremely reliable in estimating construction costs on garden-type apartments as it takes into account all the myriad costs incidental to construction which become a part of final price. Some of these costs are as follows:

1. Contract extras — can add up to 10% of base contract.
2. Architect's fees — usually approximately 3% of base contract on a building of this size.
3. Engineering fees.
4. Financing charges.
5. Interest on construction loan.
6. Settlement charges.
7. Off-site utility charges.
8. Building permits.
9. Leasing and advertising expenses."

It has been determined that St. Paul had no equity in the building and that, therefore, the value of the build-

ing could not be recovered. In that case it then follows that if St. Paul is to be placed "so far as possible, by monetary award, in the position [it] would have been if the contract had been properly performed", it must be permitted to recover those items which it has been obliged to pay out or for which it is liable that are connected with the erection of the building and which would in the normal course of circumstances have been paid from the loan from Manufacturers. The Manufacturers' loan was to be approximately $1,300,000 more than the contractor's construction cost. Had there been no breach, St. Paul not only would have had this fund from which to make payment, but it anticipated having a business in being to generate revenue for repayment of the loan which would have paid these items. Thus, portions of the construction costs paid by St. Paul or for which it still remains liable are part and parcel of St. Paul's loss directly chargeable to the breach by Manufacturers.

The trial judge correctly excluded the claim for the moving costs to be paid Dr. Merrill since that was not a part of construction. However, within the contemplation of the parties under the *Hadley v. Baxendale* rule would be the $24,000 extension fee paid Manufacturers, the $9,600 fee paid Weaver Bros. on its loan of $480,000, the $3,500 attorney fee previously mentioned, the balance due the architect said to be $108,000, the interest paid on the $480,000 mortgage, and the balance due Mullan Contracting and Real Estate Management Co., Inc., under the construction contract, said to have amounted to $270,627.41. Apparently, from the record this item is drawing interest from April 2, 1968. It would appear proper to allow interest from that date. In making computations allowance must be made for the item of $175,167.40 discussed under the second count which should be credited on the Mullan claim.

The original charge of Weaver Bros. was to be $48,-000.00 for obtaining the permanent mortgage loan and $48,000.00 for obtaining the construction mortgage loan, a total of $96,000.00. When the contract with Weaver

Bros. was rewritten in December of 1963 to eliminate the exclusive agreement with Weaver Bros. for obtention of the construction loan so as to permit St. Paul to obtain the construction loan through Merchants, Weaver Bros. required that its compensation remain at $96,000.00, $48,-000.00 which had already been paid and $48,000.00 to be paid later. St. Paul then agreed to pay, and did pay, Merchants $48,000.00 for the construction loan and was also obliged to pay Chemical a $24,000.00 fee, the same amount which Lamon of Manufacturers advised Tinley of Weaver in August, 1963, it would require as a fee for making a construction loan. It is the sum of these items to which Judge Proctor referred as "the $72,000 fee paid Merchants for the construction mortgage loan". This $72,000 also is a part of the damage sustained by St. Paul which should be allowed against Manufacturers.

The complexity of this case leads us to believe the wisest course of action would be to remand this case for entry of judgment on these items rather than attempting to compute them ourselves.

### (iv) Fourth Count

There was no appeal relative to this count which was an action against Manufacturers in tort.

### (v) Fifth Count

On this item the trial judge said:

> "This is a contract action against Weaver to recover the $48,000 paid by Plaintiff to Weaver on May 11, 1964, as a finder's fee for obtaining the permanent mortgage loan commitment from Manufacturers. I have already found against Weaver under this count. Accordingly, I will enter judgment under this count against Weaver Bros., Inc., in the amount of $48,000."

We adopt that opinion.

### (vi) Sixth Count

This was the tort action against Weaver and Manu-

facturers. As the trial judge said, nothing new was added by this count and, therefore, he entered judgment under that count in favor of the defendants. There was no appeal on this item.

> *Judgment as to punitive damages reversed; judgments affirmed as to liability and case remanded for entry of judgments in accordance with this opinion, appellees Weaver Bros. Inc. of Maryland and The Manufacturers Life Insurance Company to pay the costs.*